Henry Joseph SUMMERS,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 85–148.

Supreme Court of Wyoming.

Sept. 26, 1986.

Richard H. Honaker, Rock Springs, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., Mary B. Guthrie, and John W. Renneisen, Sr. Asst. Attys. Gen., Cheyenne, for appellee.

Before THOMAS, C.J., and ROONEY,* BROWN and CARDINE, JJ., and RAPER, J., Retired.

THOMAS, Chief Justice.

The paramount issue raised in this case is whether the trial judge by his intervention in the process of jury voir dire denied Henry Joseph Summers his right to a fair and impartial jury and in this way deprived him of his right to a fair trial. A corollary of this question is whether the judge erroneously refused to excuse members of the jury panel for cause. As additional grounds for reversal Summers asserts that the court erred in refusing to give an instruction on the right to arm oneself in defense of one's person; that he was denied his right to a fair trial by the conduct of the prosecution in injecting racial prejudice into the case; and that the prosecutor impermissibly commented upon his exercise of his constitutional right to remain silent. We are persuaded that none of the matters argued by Summers constitute error. The judgment and sentence imposed by the district court is affirmed.

In his brief Summers propounds the issues as:

"1. Did the trial court deny Appellant his federal and state constitutional rights to a fair trial by fair and impartial jurors, by creating an atmosphere in which potential jurors were intimidated and afraid to express biases and prejudices, and by erroneously refusing to excuse jurors for cause who expressed biases or prejudices against the accused?

"2. Did the trial court commit reversible error by refusing to instruct the jury on the right to arm oneself in a self-defense situation?

"3. Was Appellant denied his federal and state constitutional rights to a fair trial by the prosecution's injection of the issue of racial prejudice into the case?

"4. Did the trial court err in refusing to grant a mistrial on the ground that the prosecutor impermissibly commented upon Appellant's right to remain silent?"

The State of Wyoming offers as its statement of the issues:

"I. Was voir dire examination of prospective jurors properly conducted?

"II. Was it proper for the trial court to refuse appellant's Instruction 18, which

---

* Retired November 30, 1985.

dealt with the 'right to arm' in the context of self-defense?

"III. Was racial prejudice introduced into the trial through the cross-examination of the appellant and the direct examination of a rebuttal witness?

"IV. Did the prosecutor's questioning of a police officer who investigated the shootings constitute an impermissible comment on appellant's right to remain silent?"

The events which resulted in Summers' prosecution for first degree murder and attempted first degree murder commenced in a bar in Rock Springs. In the bar Summers approached Richmond, White and De-Paola, and after exchanging words with DePaola Summers beat him up. Summers then left the bar with a friend of his, and they were followed by the other three men. Summers went to his car and obtained a pistol from the trunk. DePaola and Richmond had decided to let the matter drop, but White had continued to follow Summers. White struck Summers, and he was joined in this effort by DePaola. When they became aware that Summers had armed himself they ran off in different directions. Summers shot White as White was running away, and the bullet struck his lower left back. Summers then fatally shot Richmond who had grabbed Summers immediately after the shooting of White.

The charges filed against Summers were first degree murder for the death of Richmond and attempted first degree murder of White.[1] The appellant was bound over for trial in the district court, and following his plea of not guilty he was tried before a jury. The jury returned verdicts of guilty of second degree murder and attempted second degree murder.[2] The trial judge then sentenced Summers to a term of 35 years to life on each count, with the sentences to run concurrently. A more detailed account of the facts involved in several contentions of error by Summers will be included in the discussion of the respective issues.

Summers' primary claim of error relates to the jury selection process. He argues that the trial judge interjected himself into the voir dire examination of the jury panel in such a way that potential members of the jury were intimidated and became afraid to express their true feelings or the facts demonstrating their bias. The second aspect of this claim of error is that the trial judge erroneously refused, on two occasions, to excuse jurors for cause after they had expressed either bias or prejudice against the accused. He asserts that these rulings required him to utilize a peremptory challenge with respect to one of these two jurors thus preventing him from peremptorily challenging other jurors. In making this claim Summers demands that the court articulate the principles underlying proper voir dire so that similar miscarriages of justice will not occur in the future.

The procedural aspects of the examination of jurors and the process of jury selection is set forth in our court rules. Rule 25, W.R.Cr.P. provides in part:

1. The statutes defining these offenses provide as follows:

 § 6-2-101(a), W.S.1977 (June 1983 Replacement)

 "(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest or kidnapping, or by administering poison or causing the same to be done, kills any human being is guilty of murder in the first degree."
 § 6-1-301(a)(i)
 "(a) A person is guilty of an attempt to commit a crime if:
 "(i) With the intent to commit the crime, he does any act which is a substantial step to-

 wards commission of the crime. A 'substantial step' is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime;
 * * *."

2. The definition of second degree murder is found in § 6-2-104, W.S.1977 (June 1983 Replacement) as follows:

 "Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life."

"(a) *Examination of jurors.*—The parties, or their attorneys, may conduct the examination of prospective jurors, but such examination shall be under the supervision and control of the court, and the court may itself conduct such further examination as it deems proper.

"(b) *Peremptory challenges.*—In every case, including the selection of alternate jurors, the state shall be entitled to the aggregate number of peremptory challenges to which the defendant or defendants are entitled. If the offense charged is punishable by death, each defendant shall be entitled to 12 peremptory challenges. If the offense charged is punishable by imprisonment for more than one (1) year, each defendant shall be entitled to 8 peremptory challenges. * * *"

This rule is supplemented by Rule 701 of the Uniform Rules for the District Courts which provides:

"(a) The only purpose of voir dire is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict.

"(b) The court shall not permit counsel to attempt to precondition prospective jurors to a particular result, comment on the personal lives and families of the parties or their attorneys, nor question jurors concerning the pleadings, the law, the meaning of words, or the comfort of jurors.

"(c) The court may inquire of the prospective jurors.

"(d) In voir dire examination counsel shall not:

"(1) Ask questions of an individual juror that can be asked collectively;

"(2) Ask questions answered in a juror questionnaire except to explore some answer in greater depth;

"(3) Repeat a question asked and answered;

"(4) Instruct the jury on the law or argue the case;

"(5) Ask a juror what his verdict might be under any hypothetical.

"(e) The court may assume voir dire if counsel fails to follow this rule. If the court assumes the voir dire, it may permit counsel to submit questions in writing."

Consideration of the substantive aspects of jury selection in a criminal case begins with § 7–11–104, W.S.1977 which provides as follows:

"Challenge for cause shall lie with both the defense and the prosecution, and all challenges for cause shall be tried by the court on the oath of the person challenged, or on other evidence, and such challenge shall be made before the jury is sworn, and not otherwise."

The challenges for cause are enumerated in § 7–11–105, W.S. 1977 which states:

"(a) The following shall be good cause for challenge to any person called as a juror on any indictment:

"(i) That he was a member of the grand jury which found the indictment;

"(ii) That he has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused;

"(iii) In indictments for an offense, the punishment whereof is capital, that his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death;

"(iv) That he is a relation within the fifth degree to the person alleged to be injured, or attempted to be injured, by the offense charged or to the person on whose complaint the prosecution was instituted, or to the defendant;

"(v) That he has served on a petit jury which was sworn in the same cause against the same defendant, and which jury either rendered a verdict which was set aside, or was discharged after hearing the evidence;

"(vi) That he has served as a juror in a civil case brought against the defendant for the same act;

"(vii) That he has been subpoenaed as a witness in the case.

"(b) The same challenges for cause shall be allowed in criminal prosecutions that are allowed to parties in civil cases."[3]

The function of these procedural rules and substantive statutes is to effectuate the constitutional rights of an accused to due process of law and to be tried by an impartial jury. In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court of the United States set forth the proposition that a fair trial is a fundamental requirement of due process and that a fair and impartial jury is one of the requirements for a fair trial. In that case the Supreme Court of the United States was concerned with pertinent aspects of the provisions in the Fifth and Fourteenth Amendments to the Constitution of the United States of America that no person shall be deprived of liberty without due process of law. The same right to due process is encompassed by Article 1, § 6 of the Constitution of the State of Wyoming. Furthermore, Article 1, § 10 of the Constitution of the State of Wyoming provides in part:

"In all criminal prosecutions the accused shall have the right to * * * a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed. * * * *"

In the Sixth Amendment to the Constitution of the United States of America this principle is encompassed by the language that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * * *"

In addressing the relationship of voir dire examination of a jury to the concept of a fair trial this court has held:

"The object of voir dire examination of members of the jury panel is to explore the possibility that a prospective juror is subject to a *challenge for cause* under our statutes * * *." (Emphasis added.)

\* \* \* \* \* \*

" * * * Voir dire examination is designed to insure the right to a fair and impartial jury by affording the parties the opportunity to discover potential prejudices and biases which would interfere with the ability of potential jurors to fairly decide the case, and the preservation of that right to prove actual bias is an integral portion of the right of a defendant to an impartial jury.

\* \* \* \* \* \*

" * * * Even though the availability of a peremptory challenge facilitates the process of the selection of an impartial jury * * *, still the purpose of the voir dire is not to explore for a reason for the exercise of the peremptory challenge." *Jahnke v. State*, Wyo., 682 P.2d 991, 999, 1003 (1984).

We also have made it an affirmative duty on the part of the trial court to see that a jury of competent, fair and impartial persons is empaneled. *Redwine v. Fitzhugh*, 78 Wyo. 407, 329 P.2d 257, 72 A.L.R.2d 664 (1958). The purpose of voir dire to explore for possible grounds for challenge for cause under state statutes was reaffirmed in *Gresham v. State*, Wyo., 708 P.2d 49 (1985).

---

**3.** The challenges for cause adopted by reference are found in § 1–11–203, W.S.1977:

"(a) Challenges for cause may be taken on one (1) or more of the following grounds:

"(i) A lack of any of the qualifications prescribed by statute which render a person competent as a juror;

"(ii) Relationship by consanguinity or affinity within the third degree to either party;

"(iii) Standing in the relation of debtor or creditor, guardian or ward, master or servant, or principal or agent to either party, or being a partner united in business with either party, or being security on any bond or obligation for either party;

"(iv) Having served as a juror or a witness in a previous trial between the same parties for the same cause of action, or being then a witness therein;

"(v) Interest on the part of the juror in the event or question involved in the action, but not an interest of the juror as a member or citizen of a municipal corporation;

"(vi) Having formed or expressed an unqualified opinion or belief as to the merits or the main question of the action. The reading of newspaper accounts of the subject matter before the court shall not disqualify the juror either for bias or opinion;

"(vii) The existence of a state of mind in the juror evincing enmity or bias for either party."

These cases which recognize the legitimate purpose of voir dire are consistent with the constitutional standard of fairness which does require that the defendant have a panel of impartial jurors. *Collins v. State,* Wyo., 589 P.2d 1283 (1979). Summers argues that this examination should not only be conducted to discover grounds for challenge for cause but also for the purpose of acquiring information to enable the party to intelligently exercise peremptory challenges. Certainly voir dire may have this serendipitous effect, but "[t]he entitlement is to a fair and impartial jury, not one sympathetic to the defendant." *Jahnke v. State,* supra, 682 P.2d at 999. The limitations which are imposed upon voir dire by Rule 701, Uniform Rules for the District Courts are sound.

■ It is against this background that we evaluate the specific complaint in this case. Summers contends that the trial judge indicated to the jury "that jurors should not be open and honest about their biases and prejudices" and that jurors who expressed such feelings "would be embarrassed, degraded and intimidated by the trial court." This argument is premised upon comments which the trial judge addressed to two veniremen during the course of the voir dire.

The first of these was a venireman by the name of Peterson, and the record discloses the following:

"THE COURT: Don't you think you could decide this case on the evidence you hear in this courtroom?

"MR. PETERSON: I'm not sure. I don't know for sure.

"THE COURT: I don't think there's enough there for challenge for cause.

"MR. HONAKER: Because of your feelings about Mr. Richmond, you couldn't follow the Judge's instructions, could you?

"MR. PETERSON: I don't think so, because of what I've heard from the people I work with and what I know about Mr. Richmond.

"THE COURT: And yet a while ago you said you could.

"MR. PETERSON: I meant to say I don't know—I meant to say—

"THE COURT: You were asked by Mr. Moneyhun if you could follow the instructions of the Court and you said you could.

\* \* \* \* \* \*

"THE COURT: And you said you talked to people. You were already told that you're to decide this case on the evidence you hear in this courtroom. And it might be a great deal different than what your friends told you.

"MR. PETERSON: Yes, Sir.

"THE COURT: Don't you think you could sit here and listen to that evidence and decide on the evidence which you hear?

"MR. PETERSON: I'm not sure. I really don't know, Your Honor, because—

"THE COURT: Can't you sit there and find out?

"MR. PETERSON: I don't think I can be fair in this case because of my familiarity with Mr. Richmond.

"THE COURT: No matter what happened?"

Following this dialogue the State stipulated that venireman Peterson could be excused for cause, and the court did so stating:

"I think he's trying to get off of jury duty is what I really think. You're excused for cause. Call another name, please."

The other venireman was named VonGuten. Prior to Mr. VonGuten's being excused for cause he had expressed concern because he was strongly opposed to any homicide committed even in self-defense. He had stated that his feelings would not make him incapable of rendering a fair and impartial verdict; but when Summers' counsel continued to question him, he began to articulate personal feelings which might prevent him from rendering an impartial verdict. This dialogue then followed:

"THE COURT: What if you had to kill?

"MR. VONGUTEN: Only I can tell myself if I have to.

"THE COURT: But what if you had to, or it was yourself that was being attacked?

"MR. VONGUTEN: I would defend myself short of death.

\* \* \* \* \* \*

"THE COURT: Short of death? What if you couldn't? What if the aggressor wouldn't quit; he was going to kill you?

"MR. VONGUTEN: I think there are a lot of other things to do before you kill somebody.

\* \* \* \* \* \*

"THE COURT: Mr. VonGuten, I don't think you're thinking well.

"MR. VONGUTEN: Well, I'm just bringing my personal feelings into the courtroom.

\* \* \* \* \* \*

"THE COURT: You mean you can't follow the law now; is that the idea?

"MR. VONGUTEN: Well, I'm just saying if it comes down to one or the other—

"THE COURT: You're going to follow your personal convictions?

"MR. VONGUTEN: I don't think it would help him in any way for me to go against that.

"THE COURT: I see. Discharged for cause."

\* \* \* \* \* \*

These are the instances which Summers relies upon to demonstrate that the voir dire was conducted in an atmosphere in which he could not adequately explore the basis for challenges for cause. In examining this claim we must recognize that Rule 25, W.R.Cr.P., places voir dire examination under the supervision of the trial court. Deference is afforded to the judgment of the trial court in determining the permissible bounds of such an examination. *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). The burden is upon the party who challenges the ruling

of the trial court to establish abuse of the trial court's discretion. *Jahnke v. State*, supra.

In some respects this case is a sequel to *Gresham v. State*, supra. In that case the same judge questioned prospective jurors about their perceived biases. Having quoted some of the comments by the judge we pointed out that these were unnecessary comments. We held, however, that it was "not error for a judge to take steps to make a prospective juror understand that a supposed bias, \* \* \* will not be grounds for successful challenge for cause if the prospective juror is able to consider the case only on the evidence presented in court under the law as instructed by the court, \* \* \*." *Gresham v. State*, supra, 708 P.2d at 56. In this case the judge also made unnecessary comments such as his final statement to Peterson and his comment that VonGuten was not "thinking well." We must remember, however, that the judge has "a duty to determine if any of the prospective jurors were so biased and prejudiced that they could not have rendered a fair and impartial verdict." *Gresham v. State*, supra, 708 P.2d at 56. See also *Lopez v. State*, Wyo., 544 P.2d 855 (1976). While we encourage citizens of this country to be faithful to their civic duties, it is not realistic to assume that every member of the community is eager to serve on a jury, particularly in a criminal case. While these comments were unnecessary, they were intended to assist the court in attempting to insure that the veniremen understood that not all supposed biases necessarily serve as the basis for a successful challenge for cause.

Summers reminds us that we cannot discern from a written transcript the impact of what occurred in the courtroom. He argues that the exchanges quoted above had the effect of chilling any open and honest communication by the veniremen of their feelings, opinions, biases and prejudices. Our appellate process, however, affords no choice but for us to rely upon the material reflected in the transcript. It is

from this information that we must evaluate the events in the courtroom.

One method of pursuing an objective analysis of the impact of what occurred with respect to voir dire is to examine the record chronologically. After the comments directed by the judge to venireman Peterson ten potential jurors admitted knowing something about the incident. One juror advised the court and counsel that she knew Summers' sister, and a number of other veniremen answered that they were acquainted with potential witnesses. As some of the veniremen were replaced because of the exercise of peremptory challenges the replacements upon inquiry admitted potential bias. One of these, Mr. Shupe, unsuccessfully was challenged for cause after he related his working relationship with the victim Richmond. Venireman VonGuten was excused for cause when he explained that he could not condone killing in self-defense in any circumstance. His position was made known after the court theoretically had chilled honest communication because of the dialogue with venireman Peterson. Following the dialogue which led to Mr. VonGuten being excused other potential jurors continued to articulate perceived problems, including service on previous juries, acquaintance with an attorney involved in the case, and knowing a relative of Summers. Juror Drysdale admitted knowing the victim, and she stated an initial uncertainty about being completely unbiased. A perusal of the transcript demonstrates that contrary to the contentions of Summers, the unnecessary comments by the trial judge did not create an atmosphere which chilled the expression of possible bias or prejudice by veniremen.

We are constrained to express our concern about intemperate remarks by members of the trial bench in connection with voir dire examination. While it may not be likely that such remarks would deprive a party of his right to a fair and impartial jury, that possibility cannot be completely discounted. Inevitably they will provide a basis for an appeal complaining of such conduct. We recognize, as Justice Brown noted in his concurring opinion in *Patter-son v. State*, Wyo., 691 P.2d 253, 271 (1984), cert. denied —— U.S. ——, 105 S.Ct. 2048, 85 L.Ed.2d 311 (1985), that trial courts often are faced with a number of reluctant veniremen. While such a problem is real the trial court should not deal with it in such a way that the accused is deprived of his constitutional right to an impartial jury. We are persuaded that this result did not ensue in this case because the record subsequent to the events complained of does not support Summers' claim that the comments of the trial judge interfered with an appropriate exploration of possible challenges for cause.

A tandem argument presented by Summers in connection with voir dire is that the failure of the trial judge to excuse Mr. Shupe and Ms. Drysdale for cause demonstrated the inhibition upon the voir dire examination which resulted in an adverse impact upon his right to a fair trial. Upon examination Mr. Shupe disclosed that he worked with the deceased victim for a number of years and Summers claims Shupe should have been excused for cause because he articulated uncertainty about being a fair and impartial juror. Summers then used one of his peremptory challenges to dismiss Shupe from the jury. Ms. Drysdale advised the court that she knew the same victim from a work relationship and she initially expressed concern about the ability to be completely fair. Unlike Shupe, however, she was not the subject of a peremptory challenge and she served on the jury which convicted Summers.

 In *Jahnke v. State*, supra, we recognized that of the challenges for cause listed in § 7–11–105, W.S. 1977 the ground of bias or prejudice for or against the accused may be the most significant. This was the ground which Summers relied upon in challenging Shupe and Drysdale for cause. Whether jurors are impartial is a question of fact to be decided by the trial judge. *Jahnke v. State*, supra. We will defer to the determinations of the trial judge in connection with jury selection. *Patterson v. State*, supra. The justification for this

deference is that the trial judge has the venireman before him and can observe his demeanor and the tenor of his answers. *State v. Davis*, 137 Ariz. 551, 672 P.2d 480 (1983). As is true with respect to the general question of credibility, this opportunity permits the finder of fact, in this instance the trial judge, to make a more accurate determination as to whether this individual can afford the accused a fair trial which is his constitutional right.

■ One commentator puts the matter in this way. "[A]ppellate courts do not reverse the determination of the trial court that a juror possessed the statutory qualifications and was free from bias unless there appears to have been a clear abuse of discretion." 2 Wright, Federal Practice and Procedure, Criminal § 383 (2d ed. 1982). The same commentator makes the point that "courts put great, though not absolute, faith in the juror's statement at voir dire that he will give the defendant a fair and impartial trial." Id. The fact only that the potential juror knows "something about the case or even [has] an opinion about it is not sufficient to support a challenge." Id. There was a time when restricted transportation required that "juries were often composed of neighbors and acquaintances who brought some personal knowledge of the defendant and of the incident to the trial. Nonetheless, the jury system developed as a fair and proper judicial device." *Chavez v. State*, Wyo., 604 P.2d 1341, 1349 (1979), cert. denied 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980). Our examination of the record does not disclose an abuse of discretion on the part of the trial judge in refusing to allow a challenge for cause of veniremen Shupe and Drysdale which was asserted on the ground that they did not meet the statutory requirement of lack of bias against the accused.

Venireman Shupe explained that he worked with the victim, Richmond, for seven years. Summers' counsel asked him if he was "outraged" about Richmond's death, and he responded that he was angry because it "[j]ust seemed a waste." Sum-

mers relies upon the following dialogue to demonstrate error in refusing to dismiss venireman Shupe for cause:

"MR. HONAKER: Do you think that because of your deep feelings for Mr. Richmond that possibly this might not be the best case for you to serve on?

"MR. SHUPE: I don't know. To be honest with you, I really don't know.

"MR. HONAKER: Okay. Even after the Judge instructs you on the law, you're still going to have those feelings for Mr. Richmond in the back of your mind, aren't you?

"MR. SHUPE: I'm sure they'd be there, but I'd try to do my best.

"MR. HONAKER: You could try to set them aside, but you can't guarantee us that you'd do that?

"MR. SHUPE: Not one hundred percent, no.

"MR. HONAKER: And you know, to serve as a juror, you have to give a hundred percent on the case; I'm sure you understand that?

"MR. SHUPE: Well, I'd listen to the evidence and decide best I could.

\* \* \* \* \* \*

"MR. HONAKER: Do you suspect him [Summers]?

"MR. SHUPE: Yes.

\* \* \* \* \* \*

"MR. HONAKER: So if I can kind of sum things up, Mr. Shupe, because of the, you know, seven-year friendship with Mr. Richmond and the way you felt about him and you felt badly when he was killed, you felt outraged as time went on, you can't guarantee us that you could put that out of your mind if you heard this case, could you?

"MR. SHUPE: Not one hundred percent, no.

\* \* \* \* \* \*

"MR. HONAKER: What are you thinking right now?

"MR. SHUPE: I have some doubt about myself. I've always tried to be fair and unbiased with other people and stuff, but

you never know what your sub-conscious makes you think.

"MR. HONAKER: But you feel some doubt about your ability to be fair and impartial in this case?

"MR. SHUPE: Some.

"MR. HONAKER: Would you mind if I asked the Judge to excuse you from this case?

"MR. SHUPE: No, I wouldn't."

After this dialogue between counsel and venireman Shupe the trial court asked Shupe:

"THE COURT: Sir, despite your knowledge of Mr. Richmond, do you believe that you could render a fair and impartial verdict on the evidence you hear in this courtroom and put aside any feelings you might have for Mr. Richmond?

"MR. SHUPE: I can try, Your Honor.

"THE COURT: Do you think you can do it?

"MR. SHUPE: Yes."

Counsel for Summers then continued to question Shupe, and he renewed his challenge for cause. The court then asked Shupe, "Can you be fair or can't you?" Shupe responded in unequivocal language by simply stating "yes, sir." At that juncture the court refused to excuse Shupe for cause.

In the instance of venireman Drysdale, she testified that she knew the victim, and in response to questions concerning the effect that such knowledge would have she made equivocal statements. In her instance Summers relies upon this dialogue to assert a claim that Drysdale said she would place the burden upon him to produce evidence:

"MR. HONAKER: Because you knew Jim Richmond would it be hard for you to believe he was killed by someone in self-defense?

"MISS DRYSDALE: I'd say yes, from what I knew.

"MR. HONAKER: No matter what the evidence turned out to be, would you still kind of have a lingering—

"MISS DRYSDALE: Not if the evidence was overwhelming."

We are not permitted to rely only upon these statements because in reviewing any determination of bias or prejudice we must look at the answers of the potential juror as a whole. *Patterson v. State*, supra.

Ms. Drysdale clarified these statements and demonstrated that she would not impose any burden of proof different from that which she was instructed to follow. When the prosecutor asked her what would happen if the State proved that the defendant might be guilty she responded, "Then he's still innocent." She said that she would place the burden on the State of proving Summers guilty beyond a reasonable doubt. In addition she said that she would follow the instructions given by the court. Following her statement that if the evidence was overwhelming she might believe that victim Richmond was killed by someone in self-defense, she responded in this way to inquiries by Summers' counsel:

"MR. HONAKER: Do you think that because of your knowing Jim Richmond and because of what people have told you out there, that you might require the Defendant to prove his innocence to you?

"MISS DRYSDALE: No, I don't really think that I would.

"MR. HONAKER: Would you, because of what you know, would you lighten the State's burden of proof a little bit? Would it be easier for them to convince you?

"MISS DRYSDALE: No.

 \* \* \* \* \* \*

"MR. HONAKER: Do you mean—would you be coming into the case with a preconception that the Defendant probably is guilty, is that what you're saying?

"MISS DRYSDALE: No, No. I don't say that."

These responses demonstrate that, contrary to Summers' contention, Ms. Drysdale would not invoke any different burden of proof than the correct one. This dialogue distinguishes the case from *Patterson v. State*, supra, in which it was clear

that the juror who should have been excluded for cause unequivocally indicated that he would use a preponderance of the evidence standard for the criminal case in issue. Ms. Drysdale responses did not leave anything to speculation in this instance. The clarification of her position specifically stated in the record demonstrates that she would require proof beyond a reasonable doubt of Summers' guilt.

Our examination of the voir dire of Shupe and Drysdale does not permit a conclusion that the trial judge clearly abused his discretion. When we give the appropriate deference to his determination this record does not support such a conclusion. We have noted that Shupe was excused upon peremptory challenge. Even though Summers argues that Drysdale served on the jury because of the refusal to excuse her for cause and the appellant's exhaustion of his peremptory challenges, the record reveals that at the time juror Drysdale was answering questions on voir dire appellant had exercised his fifth peremptory challenge, and at that point his peremptory challenges were not exhausted as claimed.

Similar rulings on challenges for cause have been upheld in other jurisdictions. In *Pyburn v. State,* 175 Ga.App. 158, 332 S.E.2d 899 (1985), a juror explained that she was acquainted with the victim and would be biased in favor of the credibility of her acquaintance. When questioned by the court, however, she said she could put aside prior knowledge and judge the case fairly on the evidence. The court held there was no abuse of discretion in refusing to permit the juror to be excused for cause. In *State v. Bashor,* 188 Mont. 397, 614 P.2d 470 (1980), the juror challenged for cause was the dance instructor of the victim's daughter. The daughter testified at the trial. When asked if she could be fair and impartial the juror said she did not think she could. Furthermore, she stated that she could not give positive assurance that she would give the defendant a fair trial, but when the trial court intervened and asked her about her position she stated she thought she could be a fair juror.

Again it was held that there was no abuse of discretion to refuse the challenge for cause.

Summers specifically claims that he was prejudiced because he was forced to exercise a peremptory challenge against venireman Shupe who should have been excused for cause. See *Parks v. State,* Wyo., 600 P.2d 1053 (1979). In the context of pre-trial publicity this court has adopted the proposition that "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Collins v. State,* supra, 589 P.2d at 1289, quoting from *Irvin v. Dowd,* supra. In this case the trial judge relied upon Shupe's claim of impartiality when he refused to permit the challenge for cause. Shupe never stated that he could not give appellant a fair trial or follow the instructions given by the court. He only advised that he would have difficulty erasing all of his memory and feelings about Richmond from the subconscious. We do not require jurors to be completely unknowing as to the circumstances or people involved in the trial. We only ask them to be free from bias or prejudice and to be able to be fair. Shupe stated he could be fair, and the trial court took him at his word.

We find no error in the refusal to excuse Shupe for cause and similarly there was no error in Drysdale's participation as a member of the jury. The trial court did not abuse its discretion in ruling upon the challenges for cause.

■ We turn then to Summers' claim that error arose out of the refusal of the trial court to give the following requested instructions:

"You are instructed that the Wyoming Constitution absolutely entitles citizens of the State of Wyoming to bear arms in defense of themselves.

\* \* \* \* \* \*

"One who has reasonable grounds to believe that another will attack him, and that the anticipated attack will be of such

a character as to endanger his life or limb, or to cause him serious bodily harm, has a right to arm himself for the purpose of resisting such attack.

"If the Defendant armed himself in reasonable anticipation of such an attack, that fact alone does not make the Defendant the aggressor or deprive the Defendant of the right of self-defense."

The court did give the following instructions with respect to the appellant's right of self-defense:

"Instruction No. 11

"* * * [I]f the Defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to use deadly force in order to defend himself. 'Deadly force' means force which is likely to cause death or serious bodily harm.

* * * * * *

"Instruction No. 11A

"* * * The claim of self-defense is not necessarily defeated if the Defendant used greater force in the heat of the fear generated in him by the alleged assault upon him than a reasonable person would have used while acting in a calm and rational manner.

* * * * * *

"Instruction No. 14

"Generally, the right to use self-defense is not available to one who is the aggressor or provokes the conflict. However, if one who provokes a conflict thereafter withdraws from it in good faith and informs his adversary by words or actions that he desires to end the conflict, and he is thereafter pursued, he then has the same right of self-defense as any other person."

In addition the court gave two other instructions concerning self-defense which advised the jury that the defendant need not have retreated but could stand his ground and use such force as was reasonably necessary if he had reasonable grounds to believe and did believe that he was in imminent danger of serious bodily harm and that although he was justified in using deadly force in self-defensive attack the right of self-defense ceased when the apparent danger no longer existed.

Summers insists, however, that under *Brown v. State,* 80 Wyo., 12, 336 P.2d 794 (1959), the court erred in refusing his instructions concerning the right to arm himself. In *Brown v. State,* supra, this court cited 41 C.J.S. Homicide § 378c.(4) as reflecting the law relating to the duty to give an instruction on the right of an accused to arm himself. That section states in part:

"Where the court restricts the issue of self-defense by submitting the issue of provoking the difficulty, as considered supra subdivision b of this section, it should also instruct the jury as to accused's right to arm himself in anticipation of danger, and, where such an instruction is warranted by the evidence, a refusal to give it constitutes error. Such an instruction, however, is neither necessary nor proper where such an issue is not raised by the evidence in the case, as where the evidence shows that, although accused was carrying a weapon at the time, he was doing so merely as was his usual custom, and not in anticipation of danger from deceased; nor is such an instruction required where the court instructs as to self-defense without any limitation as to provoking the difficulty."

*Brown v. State,* supra, is an example of the general rule adopted in Wyoming that in reviewing questions involving instructions the trial court may refuse to give proposed instructions even if they are correct so long as the principles embodied in the requested instructions are covered by the other instructions which are given. *Ostrowski v. State,* Wyo., 665 P.2d 471 (1983). In *Brown v. State,* supra, we noted that the instruction stated that the defendant had a right to shoot to kill if necessary under certain conditions, and we held that that right necessarily included the right to arm.

In Summers' trial the principles embodied in the requested instructions were covered by the instructions which were given. The right to defend oneself when in fear of serious bodily harm, even to the point of using deadly force, was included in Instruction No. 11. The proposition that Summers used deadly force and that did not alone deprive him of his right of self-defense was included in Instruction No. 11A. These two instructions, together with the other instructions which were given, encompassed the principles which were included in Summers' requested instructions. It follows that it was not error to refuse to give his instructions. *Snyder v. State*, Wyo., 599 P.2d 1338 (1979).

Summers argues, however, that in absence of instructions on the right to arm himself the jury could adopt the view that this action was an unjustified act of premeditation. It may be that the requested instructions would have properly justified Summers' act and refuted any conclusion of premeditation based solely upon that act. If this was the reason for requesting these instructions no harm was caused by the failure to cover this principle in the requested instructions because Summers was convicted of second degree murder which does not include an element of premeditation. From that perspective any error in failing to give the requested instructions did not affect a substantial right of Summers and may therefore be disregarded. Rule 49(a), W.R.Cr.P.

In his next contention of error, Summers presents the proposition that he was deprived of a fair trial because the State injected racial prejudice into the case and this unfair conduct is a ground for reversal. The issue arises because of the State's cross-examination of Summers followed by testimony of a rebuttal witness. Defense witnesses had testified that Summers was a nonviolent person and had a reputation for being truthful. Upon cross-examination the prosecutor interrogated Summers as follows:

"Q. And your vocabulary doesn't include the words that the Fernandez brothers used?

"A. No, I don't use them type of words.

"Q. Does it include the word 'nigger' when referring to black people?

"A. No, no, I got respect for—."

At that point Summers' counsel objected and the trial judge ordered the line of questioning to be dropped which it was. The State then called a rebuttal witness who testified that, while he was at Summers' car wash, Summers had struck him and stated "Listen, nigger, get out of here." The State argues that this evidence properly was used to rebut the prior testimony relating to appellant's polite demeanor and non-violent ways. Summers argues that the evidence was irrelevant and not admissible under Rule 402, W.R.E., or if relevant, it should have been excluded under Rule 403, W.R.E. He further argues that the inquiry by the prosecution was outside the scope of direct examination which made it impermissible under Rule 611(b), W.R.E. He also asserts the use of the evidence in rebuttal constituted a violation of Rule 608(b), W.R.E.[4] Our general rule concern-

---

4. These Rules of Evidence provide:
 "All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible." Rule 402, W.R.E.
 "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, W.R.E.
 "(b) *Specific instances of conduct.*—Specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." Rule 608(b), W.R.E.
 "(b) *Scope of cross-examination.*—Cross-examination should be limited to the subject

ing the admission of evidence is well established. We hold that a ruling admitting evidence is within the sound discretion of the trial court and will not be disturbed on appeal in the absence of a clear abuse of discretion. *Sanville v. State*, Wyo., 593 P.2d 1340 (1979). If there is a legitimate basis for the trial court's ruling with respect to admissibility we will not reverse on appeal. *Hopkinson v. State*, supra. With particular reference to the admission of character evidence we have held:

> "[W]here the defendant first introduces evidence of his character, the prosecution may then explore the matter raised by the accused, both on cross-examination * * * and on rebuttal." *Kwallek v. State*, Wyo., 596 P.2d 1372, 1378 (1979).

The record in this case shows that Summers first introduced evidence of his nonviolent character, and this was significant because of his claim to have been acting in self-defense. Other witnesses for the defense described Summers as someone who "never lied," "would not start a fight," and "was easy to get along with." Summers testified that he "would never bother anybody unless I had to" and that he did not use the kind of language which had been attributed to him.

Summers has not demonstrated any clear abuse of discretion on the part of the trial court in admitting this testimony. Under the circumstances the testimony of the rebuttal witness and questions concerning use of the word "nigger" were relevant and not beyond the scope of direct examination. The testimony alluded to language which could provoke violence. Using the accused appellation and scuffling with the same person is relevant with respect to the issue of Summers' propensity for violence. Summers' claim that the prosecution was attempting to evoke a response because of racial prejudice is not supported by the record. There is no indication that any of the jurors, victims or the defendant in this case were black nor that the State was

motivated to pursue any racial violence. The State was simply attempting to shed additional light upon Summer's portrayal through his testimony of himself as a peaceful person. His use of "fighting words" in connection with an altercation is probative once evidence of his non-violent character trait has been introduced, particularly in a case in which the defense of self-defense is raised. The fact that the words used were racial slurs is simply a product of what occurred and would not, except in the most extreme circumstances, result in a conclusion that the probative value was substantially outweighed by the danger of unfair prejudice in violation of Rule 403, W.R.E. Furthermore, Rule 608(b), W.R.E., deals with a prohibition against specific instances of conduct of a witness to attack or support his credibility, but the rebuttal witness in this case testified as to a pertinent trait of the accused as permitted by Rule 404(a)(1), W.R.E. Rule 608(b), W.R.E., did not prevent the use of the testimony of the rebuttal witness.

The final contention presented by Summers is one that has been addressed in a number of cases. He claims that the prosecution made an impermissible comment upon his right to remain silent. He relies essentially on *Westmark v. State*, Wyo., 693 P.2d 220 (1984). The remark upon which this claim is premised is encompassed in the following testimony of the first police officer to arrive at the scene:

"A. * * * And he said, 'I shot him.'

"Q. Who said that?

"A. The Defendant, Mr. Summers.

 * * * * * *

"Q. Had you asked him any questions at that point?

"A. No, I just asked him what was going on.

"Q. That's the first thing he told you?

"A. Yes, sir.

"Q. Did he tell you at that point why he shot him?

---

matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, per-

mit inquiry into additional matters as if on direct examination." Rule 611(b), W.R.E.

"A. No, sir.

"Q. Just 'I shot him.'

"A. Yes, sir."

The incident recounted by the officer occurred immediately upon his arrival at the scene before Summers had been arrested and before he had been given any advice of his constitutional rights in accordance with the decision of the Supreme Court of the United States in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This is the only statement in the record concerning Summers' silence. Summers claims, however, that under *Westmark v. State*, supra, the comment is prejudicial per se and requires reversal. The line of cases which is involved reaches back to *Clenin v. State*, 573 P.2d 844 (1978) which established a prejudicial per se standard if a comment is made upon the exercise by the accused of his right to silence. That prejudicial per se rule was set aside in *Richter v. State*, Wyo., 642 P.2d 1269 (1982), which promulgated a harmless error standard for review. Richter then was overruled by *Westmark v. State*, supra, and the holding in Westmark recently was affirmed in *Brewster v. State*, Wyo., 712 P.2d 338 (1985). In *Brewster v. State*, supra, this court held that there can be no comment on the "silence following arrest."

In *Cheatham v. State*, Wyo., 719 P.2d 612 (1986), we explained the justification for the rule followed in *Clenin v. State*, supra, and *Westmark v. State*, supra. Essentially that rule is premised upon the proposition that once an accused has been advised of his constitutional right to silence whether he does not speak from that point on is an equivocal circumstance. The cases followed in our Wyoming adoption of this rule are premised upon a proposition that it then is unfair for the State to suggest in any manner that the silence of the accused is incriminating. Like *Cheatham v. State*, supra, this case is distinguishable from the other authorities. This comment related to the circumstances which occurred immediately upon the officers' arrival at the scene. It was a simple recitation that Summers had made no further comment, and it did

not in any way address his exercise of his constitutional right of silence. While in *Richter v. State*, supra, the majority assumed that the comments related to post-arrest silence, we have not been confronted previously with any necessity for drawing a clear distinction between silence which occurs before arrest and silence which occurs after arrest. In this case that distinction is significant.

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court of the United States held that the use for impeachment purposes of an accused person's silence at the time of arrest and after receiving his *Miranda* warnings violated the due process clause of the Fourteenth Amendment to the Constitution of the United States of America. The court pointed out that silence following the *Miranda* warning may be nothing more than an exercise of those rights. The court said "Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." 96 S.Ct. at 2244. In *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court then distinguished the use of pre-arrest silence for purposes of impeachment. In rejecting a defendant's claim that use of his pre-arrest silence to impeach his credibility denied him the fundamental fairness guaranteed by the Fourteenth Amendment, the Supreme Court said:

"[N]o governmental action induced petitioner to remain silent before arrest. The failure to speak occurred before the petitioner was taken into custody and given *Miranda* warnings. Consequently, the fundamental unfairness present in *Doyle* is not present in this case." *Jenkins v. Anderson*, supra, 100 S.Ct. at 2130.

In the *Jenkins* case the Supreme Court also refuted a contention that use of the pre-arrest silence to impeach the defendant's credibility violated the Fifth Amendment to the Constitution of United States of America. The Court specifically recognized that a person facing arrest may not remain si-

lent if his failure to speak can be used to impeach him at trial, but it pointed out that the Constitution does not forbid every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights, quoting *Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 1984, 36 L.Ed.2d 714 (1973). This case then poses an issue as to whether the doctrine of *Jenkins v. Anderson,* supra, extends to a situation in which testimony concerning a defendant's silence prior to arrest is presented in the case in chief. Furthermore, we must consider Summers' rights in the light of Art. 1, § 11 of the Constitution of the State of Wyoming as well as the Fifth Amendment to the Constitution of the United States of America.

Federal courts have considered but not resolved use of pre-arrest silence. In *United States v. Caro,* 637 F.2d 869 (2d Cir. 1981), the Court of Appeals noted that it could not find any decision which permitted the use of silence, in the case of a suspect who had been given no *Miranda* warnings and was entitled to none, as part of the government's case in chief. The court did not predict what the future impact of Jenkins might be. In *United States v. Blanton,* 730 F.2d 1425 (11th Cir.1984), the precise issue was presented in the form of a question as to "whether the prosecution may allude in its case in chief to a defendant's pre-arrest silence in response to governmental questioning, where defendant subsequently takes the stand and testifies." 730 F.2d at 1433. The Eleventh Circuit Court of Appeals invoked a harmless beyond reasonable doubt rule, however, and did not then decide the question of whether the comment was error. In *United States v. Caro,* supra, the issue also was disposed of under a harmless error approach.

Addressing the question directly we hold that the use in the State's case in chief of the pre-arrest silence of a defendant does not violate the Fifth Amendment to the Constitution of the United States of America. The precise holding in *Jenkins v. Anderson,* supra, does not reach this proposition, but the rule is supported by the reasoning in that case. The question to be addressed is whether this use of a defendant's silence impairs to any appreciable extent the policy represented by the Fifth Amendment right to silence. "[T]he central purpose of the Fifth Amendment privilege is to protect the defendant from being compelled to testify against himself at his own trial." *Jenkins v. Anderson,* supra, 100 S.Ct. at 2131 (Stevens, J. concurring). In the context of a trial the failure of the accused to testify is presumed to be an exercise of his constitutional right and any comment on his failure to testify deters him from exercising that privilege. The circumstance of silence prior to the person being in custody cannot be presumed to be an exercise of the right not to testify against himself. "The Fifth Amendment privilege against self-incrimination is not self-executing." *Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980). There is no reason to presume that a person under no official compulsion to speak is asserting his Fifth Amendment privilege in not speaking. It would seem fair under those circumstances in which the government has made no commitment to the defendant with respect to his silence that he should articulate his intention to exercise his constitutional privilege if that is what he is doing. Otherwise the use of the silence at trial does not impair the justification for the constitutional privilege.

■ ■ There is nothing in Art. 1, § 11 of the Constitution of the State of Wyoming which compels a different conclusion. In the future we will follow *Westmark v. State,* supra, and *Clenin v. State,* supra, to the effect that Art. 1, § 11 of the Constitution of the State of Wyoming "any comment upon an accused's exercise of his right of silence, whether by interrogation of the accused himself, or by interrogation of others inherently is prejudicial, and will entitle an accused to reversal of his conviction." *Clenin v. State,* supra, 573 P.2d at 846. This rule should be limited, however, to comments upon the silence of the accused either after his arrest or after he has

been advised of his constitutional right to remain silent. The State relies upon *Parkhurst v. State*, Wyo., 628 P.2d 1369 (1981), cert. denied 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), for its argument that the responses by the officer were not a "comment," but were only references to appellant's silence. The State contends that this testimony does not fall under the rule of *Westmark v. State*, supra, and *Clenin v. State*, supra. We will not concern ourselves, however, with whether the response was a "comment" because of the rule we have announced with respect to pre-arrest silence.

Recognizing that dicta in previous decisions might indicate that pre-arrest silence should be treated no differently than post-arrest silence we point out that those prior cases dealt with comments on post-arrest silence. Our holding does not mean that it is necessary for a person to be advised of his constitutional rights in order to be able to assert them. *Westmark v. State*, supra. This holding contemplates only that silence prior to the arrest of an accused will not be presumed to be an exercise of the accused's rights pursuant to either the Fifth Amendment to the Constitution of the United States or Art. 1, § 11 of the Constitution of the State of Wyoming. In the absence of a showing that the silence constituted an exercise of the accused's constitutional privileges the use of the silence at trial does not impermissibly infringe on the constitutional rights of an accused.

Summers has not sustained his burden on appeal of establishing an abuse of discretion in the conduct of the voir dire examination of the jury veniremen nor in the rulings with respect to his challenges for cause. He has failed to show in this regard that he was denied a fair trial. Furthermore, no error appears with respect to the refusal to give Summers' requested instructions on the right to arm himself nor

in the admission of evidence. Finally, the statements asserted to be a comment upon his exercise of his right of silence are not within the rule of our prior decisions and in this instance there was no error with respect to such testimony.

The judgment and sentence of the trial court based upon the verdicts of guilty of second-degree murder and attempted second-degree murder returned by the jury is affirmed.

BROWN, Justice, concurring.

I concur only in the result of the majority opinion.

ROONEY, Justice, specially concurring, with whom RAPER, Retired Justice, joins.

I agree with the majority opinion with reference to the first three issues there treated, and I agree with the result reached by the majority opinion on the fourth issue,[1] but I cannot agree with the reasoning by which such result is reached.

The majority opinion attempts to sidestep the illogical position in which the Court placed itself with the decision in *Westmark v. State*, Wyo., 693 P.2d 220 (1984), but only creates another improbable situation. Westmark held that any comment on silence is per se reversible error. The majority opinion remarks that it will not concern itself "with whether the response [to the officer] was a 'comment'" and elects to limit the Westmark holding to comments upon silence of the accused "either after his arrest or after he has been advised of his constitutional right to remain silent." Subsequent language in the opinion infers that Westmark's holding of per se reversible error for comment on silence would also apply if the accused stated affirmatively, even before being arrested or being advised of his constitutional right, that he was exercising such right. The opinion

---

1. Appellant words the fourth issue:
 "Did the trial court err in refusing to grant a mistrial on the ground that the prosecutor impermissibly commented upon Appellant's right to remain silent?"
 Appellee words the fourth issue:
 "DID THE PROSECUTOR'S QUESTIONING OF A POLICE OFFICER WHO INVESTIGATED THE SHOOTINGS CONSTITUTE AN IMPERMISSIBLE COMMENT ON APPELLANT'S RIGHT TO REMAIN SILENT?"

recites, "[t]his holding contemplates only that silence prior to the arrest of an accused will not be presumed to be an exercise of the accused's rights," and, "[t]here is no reason to presume that a person under no official compulsion to speak is asserting his Fifth Amendment privilege in not speaking." At this point, it must be pointed out that Westmark and its progeny did not apply a presumption to the comment on a right to remain silent. Westmark made the comment *per se* reversible error. I will note infra the impropriety of *presuming* a failure to exercise a constitutional right.

The holding of the majority opinion then is that silence before the time of arrest and the giving of the *Miranda* warning, unless appellant said, "I am exercising my right to silence," can be emphasized by the prosecution through testimony to a jury to show that the accused did not say "my defense to a homicide charge is self-defense" in establishing the fact that self-defense is an afterthought. I believe the reverse is proper law: The constitutional right to silence exists at all times—before arrest, at arrest and after arrest; before a *Miranda* warning and after it. If there is a presumption relative to the exercise of the right, it should be in favor of its exercise and not to the contrary. An impermissible comment on the exercise of the right is error, the only question being whether or not the comment is *reversible* error—i.e., whether or not it is harmless error.

Under the majority opinion, it will be permissible to comment all one wants to about the silence of the accused before an arrest was made and before the *Miranda* warning was given to him. It is, thus, profitable for the prosecution to delay making the arrest and giving the warning as long as possible in anticipation of not only a voluntary incriminating statement by the accused which could be subject of comment at trial but also the failure on the part of the accused to give explanations of incriminating factors, upon which explanations he later bases his defense, so that comment thereon can be made at trial.

Of course, an accused can waive his constitutional right to remain silent, making a statement made by him to be proper evidence and subject to comment by the prosecution. In effect, the appellant did so in this case by immediately volunteering the information, " 'I shot him.' " A distinction must be carefully made in this case in this respect. The defense at trial was self-defense. Appellant does not object to the police officer's testimony that appellant told him, " 'I shot him.' " He objects to the inference conveyed to the jury by the subsequent question and answer to the effect that his contention of self-defense was an afterthought. He contends that the question, "Did he tell you *at that point* why he shot him?" (emphasis added) was for the purpose of informing the jury that appellant's failure to then assert self-defense—his exercise of a constitutional right to remain silent—infers that his actions were not in self-defense. Following are the pertinent questions and answers upon which the issue is based:

"A * * * And I walked over and I said, 'What's going on here?' And he said, 'I shot him.'

"Q Who said that?

"A The Defendant, Mr. Summers.

"Q Where was he when [he] said, 'I shot him.'

"A He was seated inside the car.

"Q Had you asked him any questions at that point?

"A No, I just asked him what was going on.

"Q That's the first thing he told you?

"A Yes, sir.

"Q *Did he tell you at that point why he shot him?*

"A *No, sir.*

"Q *Just 'I shot him.'*

"A *Yes, sir.*" (Emphasis added.)

The emphasized portion of the testimony is not much different from one of the comments held impermissible in Westmark:

" ' * * * At that point, did the Defendant, or any time during the course of your conversation with the Defendant,

raise the issue that he had been acting in self defense?' " 693 P.2d at 221.

I believe the comment in this case was an impermissible comment on silence. If it was not intended to draw the jury's attention to appellant's failure to assert self-defense at the scene of the crime—i.e., "at that point"—there was no purpose for the question at all.

However, I concur with the result reached by the majority opinion, since I find the error to be harmless. It would serve no useful purpose to again repeat the logic of *Richter v. State,* Wyo., 642 P.2d 1269 (1982); the dissent of Justice Brown in which I joined in *Westmark v. State;* my dissenting opinion in *Brewster v. State,* Wyo., 712 P.2d 338 (1985), in which Justice Brown joined; my special concurring opinion in *Gomez v. State,* Wyo., 718 P.2d 53 (1986), in which Justice Brown joined; and my specially concurring opinion in *Cheatham v. State,* Wyo., 719 P.2d 612 (1986). Applying that logic to this case, the facts as recited in the majority opinion were such that there was no reasonable probability that the verdict might have been more favorable to appellant absent the error in allowing the question and answer relative to the exercise of appellant's right to silence. The undisputed facts before the jury relative to the incidents preceding and at the time of the shooting reflect that upon which the contention of self-defense was based, and the impermissible comment cannot reasonably be said to have any impact on the verdict. As recited in my special concurrence in *Gomez v. State,* 718 P.2d at 58:

" * * * Rule 49(a), W.R.Cr.P., defines harmless error as:

" 'Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.'

"Rule 7.04, W.R.A.P., provides:

" 'Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.'

"We have held that before a constitutional error can be held harmless, the burden is on the State to demonstrate, and the

Court must be able to declare a belief, that it was harmless beyond a reasonable doubt. *Campbell v. State,* Wyo., 589 P.2d 358 (1979). There must be a reasonable possibility that in the absence of the error the verdict might have been more favorable to the defendant. *Reeder v. State,* Wyo., 515 P.2d 969 (1973); *Hoskins v. State,* Wyo., 552 P.2d 342, reh. denied 553 P.2d 1390 (1976), cert. denied 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977)."

In summation, I believe the constitutional right to remain silent exists before and after arrest, before and after a *Miranda*-type warning, and whether articulated by the accused or not. I believe the accused can waive the right, expressly or impliedly such as by volunteering information. I believe a comment on the exercise of such right is impermissible absent "opening of the door" by the defense, or some similar circumstance, but that it is not per se reversible error and that it can be harmless. In this case, I believe that the comment was impermissible, but the resulting error was harmless.

CARDINE, Justice, dissenting.

Appellant was convicted of one count of second degree murder in violation of § 6-2-104, W.S.1977, and one count of attempted second degree murder in violation of § 6-1-301(a)(i) and § 6-2-104, W.S.1977. He was sentenced to the Wyoming State Penitentiary for two concurrent terms of 35 years to life. On appeal, he contends that the trial judge violated his constitutional right to an impartial jury by failing to excuse two biased jurors for cause and by directing threatening and embarrassing remarks to jurors, the effect of which was to intimidate the panel and cause them to stop admitting bias or anything that might displease the court. Unlike the majority, I believe that both arguments have merit.

The atmosphere in which voir dire was conducted in this case is best illustrated by the following exchanges between the court, the jury and counsel:

"MR. HONAKER: Your Honor—

"THE COURT: You're going into such detail with each one of these people, who they know, what they know. It's unbelievable to me. You've already asked—they've already said that they didn't know enough of these people to influence them in any way. I mentioned that to you about four times already.

\* \* \* \* \* \*

"MR. HONAKER: Your Honor, during the State's voir dire, the State asked if any of these jurors knew any of these witnesses and almost every hand was raised and almost everybody knew more than one. And as of this time, we don't have any idea of who they know or who they don't know and what the nature of the relationships are.

\* \* \* \* \* \*

"THE COURT: I'm going to sustain the objection. Ladies and gentlemen, Mr. Moneyhun read to you the list of witnesses; do you recall that? All right. Mr. Moneyhun asked you if your knowledge of any of those witnesses would influence you in your determination of this case. Would it?

"(Entire jury panel responded 'no.')

"All right. That's it as far as that line of questioning is concerned."

Later the court relented and advised defendant's counsel:

"I'm going to let you do this. I'm going to let you ask each juror individually whether or not their knowledge of any of the witnesses would affect their ability to make a—or render a fair verdict, without going into any more detail than that. You ask each one of them individually that question."

Then, even later, the court protested:

"How many opinions are you going to try to get from them? You're asking their opinion on a million things."

When Mr. Peterson was excused for cause, the court observed:

"I think he's trying to get off of jury duty is what I really think. You're excused for cause \* \* \*."

The court also made derisive remarks about Mr. VonGuten's personal convictions with respect to self defense when it said to Mr. VonGuten, "I don't think you're thinking well." Mr. VonGuten felt compelled to defend himself, replying: "Well, I'm just bringing my personal feelings into the courtroom."

The judge refused a recess which would have enabled the jurors to use the restrooms. That must have speeded up voir dire considerably. Thus, the following occurred. A juror during voir dire said:

"Your Honor, could I be excused to go to the bathroom for a second, or is this going to drag out for a while more? Before my bladder—

"THE COURT: Go ahead.

"MRS. LANE: May I, too, sir?

"THE COURT: Yes, go ahead.

"MR. MONEYHUN: May I, too, Your Honor?

"MR. HONAKER: Your Honor, could we take a ten-minute recess?

"THE COURT: No, we're going to continue until this is done.

"MR. HONAKER: Could I be excused for just a minute?

"THE COURT: Yes, go ahead."

The totality of the above demonstrates the kind of closed atmosphere which very likely will compromise the voir dire process.

## DENIAL OF CHALLENGE FOR CAUSE

In this atmosphere jury voir dire proceeded. Three jurors who were co-employees of the deceased victim were called and questioned. The voir dire of the first juror, Mr. Peterson, was as follows:

"MR. HONAKER: Your Honor, I'd challenge this juror for cause.

"THE COURT: Mr. Peterson?

"MR. PETERSON: Yes.

\* \* \* \* \* \*

"THE COURT: Don't you think you could sit here and listen to that evidence and decide on the evidence which you hear?

"MR. PETERSON: I'm not sure. I really don't know, Your Honor, because—

"THE COURT: Can't you sit there and find out?

"MR. PETERSON: I don't think I can be fair in this case because of my familiarity with Mr. Richmond [the victim].

\* \* \* \* \* \*

"THE COURT: Well, I'm still not going to excuse you for cause simply because you contradicted yourself about five times.

"MR. PETERSON: I haven't meant to be. I know the man; I felt I know him well, and I don't feel that I can be fair to the Defendant in this case from me knowing the man that he killed."

This juror was excused when the prosecutor consented to his release by stating:

"Your Honor, if it please the Court, in the interest of fairness and getting this thing moving, State would stipulate that he could be excused for cause.

"THE COURT: I think he's trying to get off of jury duty is what I really think. You're excused for cause. Call another name, please."

The next two jurors, who were also co-employees of the deceased victim, expressed personal doubts about their impartiality but were not excused for cause. Mr. Shupe, a friend and co-worker of the victim for seven years, admitted that it would be difficult for him to be fair because he was upset about his friend's death. In response to questions from defense counsel, he said:

"MR. SHUPE: I'm a brake and switchman.

"MR. HONAKER: Do you know what Mr. Richmond did for the railroad?

"MR. SHUPE: He was also a brake and switchman.

\* \* \* \* \* \*

"MR. HONAKER: And did you begin working together with Jim Richmond in October of 1977?

"MR. SHUPE: Yes, sir.

\* \* \* \* \* \*

"MR. HONAKER: And did you socialize with him as well?

"MR. SHUPE: On occasions I had a drink with him.

"MR. HONAKER: He was a friend of yours; is that correct?

"MR. SHUPE: Yes.

\* \* \* \* \* \*

"MR. HONAKER: If you were on trial, would you feel comfortable having a close friend of the person that was killed sitting on your jury?

"MR. SHUPE: No.

"MR. HONAKER: Why not?

"MR. SHUPE: There's always that doubt that whatever the verdict was, it could have been different. You never know what another person's thinking.

"MR. HONAKER: What are you thinking right now?

"MR. SHUPE: I have some doubt about myself.

\* \* \* \* \* \*

"THE COURT: Sir, despite your knowledge of Mr. Richmond, do you believe that you could render a fair and impartial verdict on the evidence you hear in this courtroom and put aside any feelings you might have for Mr. Richmond?

"MR. SHUPE: I can try, Your Honor.

"THE COURT: Do you think you can do it?

"MR. SHUPE: Yes.

"THE COURT: All right. I'm not going to permit the challenge for cause."

Defense counsel was forced to use a peremptory challenge to remove Mr. Shupe from the jury.

The second juror who expressed a bias during voir dire was Mrs. Drysdale, who was also a co-worker of the victim. In twenty-one different replies to voir dire questions she expressed uncertainty about her ability to fairly judge appellant. She repeatedly suggested that her acquaintance with the victim might influence her. Twice she said that the evidence would have to be "overwhelming" before she could find that appellant acted in self-de-

fense. The following is representative of what was said:

"MR. HONAKER: Can you kind of tell me how well you knew Jim Richmond, in some detail?

"MRS. DRYSDALE: Well, I didn't know him that well. A couple of my girlfriends had gone out with him. And I just saw him day to day at work. I'm a clerk; he's a brakeman.

*　　*　　*　　*　　*　　*

"MR. HONAKER: How do you feel—if you were sitting over there and you were the Defendant, would you be comfortable with a person in your frame of mind sitting on your case?

"MRS. DRYSDALE: I don't think so.

"MR. HONAKER: Tell us why you wouldn't be comfortable.

"MRS. DRYSDALE: I guess I'm prejudiced because I knew him. I don't know.

"MR. HONAKER: Your Honor, I think based on her answers, I challenge for cause.

"THE COURT: Mrs. Drysdale, I don't know whether you understand what's going on here or not. What I want to know is this: Do you think you could sit here and listen to the evidence brought forth in this court and decide the case solely on that evidence, pursuant to the instructions of the Court given to you on the law?

"MRS. DRYSDALE: I think I could, yes.

*　　*　　*　　*　　*　　*

"MR. HONAKER: But why would it be that you wouldn't be comfortable with a juror of your frame of mind sitting on your case?

"MRS. DRYSDALE: It's just like I said before, because I knew him, you know. I guess the evidence would have—I don't know.

"MR. HONAKER: Because you knew him, you think the evidence would have to what?

"MRS. DRYSDALE: I said the evidence would have to be overwhelming."

The trial court denied appellant's challenge for cause, and Mrs. Drysdale sat on this jury and voted to find defendant guilty.

This court sees this case as a "sequel to *Gresham v. State,*" Wyo., 708 P.2d 49 (1985). I do not. In Gresham one juror said he was biased, one said he could not hear, and one—a co-employee of defendant—said she could not fairly judge the facts of the case. The judge excused for cause only the last juror with the statement:

"I can't understand people like you, Miss Pivik, particularly with your knowledge of the law and your association with the law for so many years in Rock Springs. You're excused for cause." Id. at 54–55.

But in Gresham there was no objection, and we considered only whether there was plain error. In this case counsel did object stating:

"First, the Defendant was forced ,to waste a peremptory challenge on Mr. Shupe, a close personal friend and fellow worker with the deceased, James Richmond. The voir dire exam of Mr. Shupe revealed he had very strong personal feelings for Mr. Richmond, and was extremely upset by his death. It was error for the Court to refuse to excuse Mr. Shupe for cause.

"Second, Mrs. Drysdale now sits on this jury and will be a part of its deliberations and verdict. The voir dire examination of Mrs. Drysdale revealed that she also knew Mr. Richmond through her work with him at the Union Pacific yard; that she was prejudiced and that she would not want a juror of her frame of mind sitting on her own case. Her extreme insecurity about being fair and impartial was overcome by the tone and forcefulness of the Court's questioning of her. Her questionnaire also indicates that her husband is a brakeman for Union Pacific. And we know from Mr. Shupe's answers on voir dire that the Union Pacific brakemen worked closely together and rely on each other on a weekly, if not a daily basis.

"Mr. Richmond was employed as a brakeman at Union Pacific for seven years.

"The Defendant exhausted all peremptory challenges and re-newed his challenge of Mrs. Drysdale for cause."

I see this case as similar to *Patterson v. State*, Wyo., 691 P.2d 253 (1984), cert. denied —— U.S. ——, 105 S.Ct. 2048, 85 L.Ed.2d 311 (1985), wherein we said:

"The juror steadfastly maintained his prejudice against those involved in marijuana, even to the extent of asserting that such would make him partial and a juror whom he would not want to decide a case in which he was a defendant. Yet he agreed to act only on the evidence and according to the instructions.

"Ordinarily, we defer to the action of the trial court in connection with jury selection. In this instance, however, the bias or prejudice of juror Taylor was definitely evidenced. * * * The error is manifest." (Citations and emphasis omitted.) Id. at 256.

And so it is in this case; the error is also "manifest." These jurors honestly said they could not be impartial, but that as decent, honest persons they could be fair and sit on the case. There is something wrong with a process by which this is accomplished, and I have a deep feeling that there is something terribly wrong with forcing a man to be tried upon two first degree murder charges by a jury containing co-employees of the victim—co-employees who, in response to voir dire questions, said they should not sit on the jury. What was at stake for appellant in this case was two sentences of 35 years to life in the penitentiary.

In a similar case, it was said that

"where the only real issue is a sentence of life or a sentence of death, it can hardly be said that a 17 year co-worker of the father of the slain policeman, who has taken the time to give his condolence to the father, is an unbiased juror. Neither should an employee of a law enforcement agency be considered a competent juror where the killing results from an assault upon an officer of the law

while acting in the scope of his employment. Robert Taake did not qualify as an impartial juror * * *.

"[W]here the juror testifies that he is not one hundred percent sure that he can lay aside his previous impressions or opinions, we do not see how any discretion on the part of the court can add any assurance that the verdict will be rendered only upon the evidence presented in court." *Swindler v. State*, 264 Ark. 107, 569 S.W.2d 120, 123 (1978).

In *Nailor v. People*, 200 Colo. 30, 612 P.2d 79 (1980), a potential juror said:

"I don't think I should sit on the jury. A week ago I had my car broken into and burglarized. And it was a bad experience and I don't think it would be fair. I have been thinking about it all night and I don't think I could be fair.

* * * * * *

"The trial court here abused its discretion by failing to excuse this potential juror. There was no dispute here about the fact that the juror doubted she could be fair because of her recent 'bad experience.' From this clear expression of bias, it would be difficult for a trial court to assume that such a juror could render an impartial verdict. Justice would have been served by excusing this potential juror." Id. at 80.

When a prospective juror said he would "prefer not to judge the case of his close personal friend," it was proper that he be excused, *State v. Albert*, La., 381 So.2d 424, 429 (1980), and it was held error to refuse to excuse a juror for cause where he was unsure whether he could be impartial. *State v. Moore*, Utah, 562 P.2d 629 (1977).

I cannot agree with the majority that Mr. Shupe and Mrs. Drysdale were impartial jurors just because they succumbed to the trial court's pressure and said they could be fair. They knew the deceased personally and had heard co-workers discuss the case. Considering the nature of those interactions, it is likely that they had real biases. There is no indication that their expressions of bias were a pretext to es-

cape jury duty. There were surely others who could have served on this jury who were not co-employees having a personal relationship with the victim. The court refused to excuse either Mr. Shupe or Mrs. Drysdale for cause. A trial court's erroneous denial of a challenge for cause is prejudicial when it forces the challenging party to use a peremptory challenge which could otherwise have been used to excuse another juror. *Patterson v. State*, supra, 691 P.2d at 256.

An abuse of discretion occurs when a court acts in a manner that exceeds the bounds of reason under the circumstances. When there is no reasonable basis upon which a court could make its ruling, there is an abuse of discretion; and in voir dire it is essential that the court always exercise its discretion consistent with essential demands of fairness. *Gresham v. State*, supra, 708 P.2d 49; *Jahnke v. State*, Wyo., 682 P.2d 991 (1984). I would hold the trial court abused its discretion when it refused to excuse Mr. Shupe and Mrs. Drysdale for cause.

### INTIMIDATING ATMOSPHERE

Appellant contends also that the trial court created an atmosphere in which potential jurors were intimidated and afraid to express bias and prejudice which resulted in his being denied a fair trial. The majority recognizes the potential for this occurring when in its opinion it states:

"In this case the judge also made unnecessary comments such as his final statement to Peterson and his comment that VonGuten was not 'thinking well.'"

and

"We are constrained to express our concern about intemperate remarks by members of the trial bench in connection with voir dire examination. While it may not be likely that such remarks would deprive a party of his right to a fair and impartial jury, that possibility cannot be completely discounted. Inevitably they will provide a basis for an appeal complaining of such conduct."

The court then concludes that potential jurors were not intimidated because four of the next ten expressed their concerns about serving as jurors. But what of the other six jurors? Can we ever know how they might have responded to voir dire questions in a more free and open atmosphere?

There are many jurors who are not assertive enough to overcome the kind of judicial pressure exerted in this case. The following statements from Justice Rose's dissent in *Gresham v. State*, supra, 708 P.2d at 57, 59, are apropos:

"When the voir dire procedure penalizes open and honest responses from venire persons, no meaningful exploration of biases and prejudices can occur, and the right of the accused to a fair trial is thwarted.

\* \* \* \* \* \*

"While we cannot know with certainty that one or more of these individuals harbored feelings and opinions inconsistent with a fair trial, neither can we say that none of the jurors held such biases. Appellant in this situation was denied the meaningful exercise of his peremptory challenges as well as his challenges for cause. Accordingly, the voir-dire process failed to serve its intended purpose of insuring appellant a trial before unbiased and unprejudiced jurors."

The majority also excuses the trial court's intimidating conduct, to the extent it affected appellant's peremptory challenges, by clinging to the illogical rule that the only purpose of voir dire is to discover grounds for challenges for cause. As I stated in my dissent in *Jahnke v. State*, supra, 682 P.2d at 1047:

"Common sense tells us that peremptory challenges were intended to provide an additional safeguard to the required fair trial. They cannot be exercised in a vacuum or by guess and conjecture, and accomplish this purpose. The litigants, therefore, should have as full knowledge as possible of prospective jurors to per-

mit an intelligent decision in the selection process."

My view is supported by many authorities. For example, § 15–2.4 of the American Bar Association Standards for Criminal Justice (2nd ed. 1982) states:

"A voir dire examination should disclose grounds for challenge for cause *and facilitate intelligent exercise of peremptory challenges.*" (Emphasis added.) See also *State v. Peacher*, W. Va., 280 S.E.2d 559 (1981); *State v. Brown*, Mo., 547 S.W.2d 797 (1977).

## VOIR DIRE GUIDELINES

There will always be some veniremen who try to avoid jury duty by claiming they are biased. But there are better ways of dealing with the problem than tainting the entire jury panel. *Patterson v. State*, supra, 691 P.2d at 271 (Brown, J., specially concurring). Trial judges may inform the jurors that those who are unable to serve on the present panel will be eligible for selection on the next case. Section 1–11–123, W.S.1977. The judges can emphasize the purpose and importance of jury service. And, if necessary, they can reprimand the shirkers in chambers after they are excused.

A criminal defendant has a right to an impartial jury. *Collins v. State*, Wyo., 589 P.2d 1283, 1289 (1979); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). It is the trial judge's duty to make sure that he gets one. *Redwine v. Fitzhugh*, 78 Wyo. 407, 329 P.2d 257, 260 (1958). In fact, the United States Supreme Court has said that a trial judge must be zealous in protecting the rights of the accused during jury selection. *Dennis v. United States*, 339 U.S. 162, 70 S.Ct. 519, 521, 523, 94 L.Ed. 734 (1950). A trial judge should not allow either his own impatience or his annoyance with jurors to interfere with his responsibility to ensure an impartial jury. I would have reversed and remanded for a new trial.