Joseph Steven TORTOLITO,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 92–237.

Supreme Court of Wyoming.

Aug. 18, 1995.

Tim Newcomb of Grant & Newcomb, Cheyenne, for appellant.

Joseph B. Meyer, Attorney General; D. Michael Pauling, Sr. Assistant Attorney General; Mary Beth Wolff, Sr. Assistant Attorney General, Cheyenne, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

GOLDEN, C.J., delivers the opinion of the Court; THOMAS, J., files a dissenting opinion.

GOLDEN, Chief Justice.

In *Tortolito v. State*, 885 P.2d 864 (Wyo. 1994), a divided court affirmed Joseph Steven Tortolito's (Tortolito) conviction and sentence for robbery. We granted Tortolito's petition for rehearing and heard reargument on March 14, 1995.

We withdraw our earlier opinion, reverse the conviction and sentence for impermissible prosecutorial comments upon Tortolito's pre-arrest silence, and remand for a new trial.

## FACTS

On January 20, 1992, a passenger at the Greyhound bus station in Cheyenne accused Tortolito of robbery. When confronted by a bus driver about the passenger's accusation, Tortolito allegedly admitted taking the passenger's money. Police were summoned and were told by a bus station employee that Tortolito had robbed a passenger. Police detained, questioned, searched, and again questioned Tortolito, and then arrested him for robbery. Tortolito was tried before a jury which convicted him of the robbery on April 15, 1992. Following post-trial motions, the trial court granted a new trial because of an improper closing argument by the prosecutor. Tortolito was tried a second time and again a jury convicted him of robbery on June 23, 1992.

Tortolito's subsequent appeal presented seven issues, but the primary concern involved his contention that during trial the prosecutor had impermissibly commented upon his pre-arrest silence. Our original majority opinion determined that prosecutorial comments about an accused's silence were impermissible and required reversal only when the silence to which comments were directed occurred either after arrest or the giving of advice of the constitutional right to remain silent. Deciding that Tortolito was arrested only after the inquiries by the officers to which he remained silent, the court

concluded that no comment upon his right to remain silent had occurred. The court then held that, in light of the "peculiar dynamics" of the case, *viz.*, Tortolito's affirmative admission to a bus driver before law enforcement officers arrived on the scene, once an accused has made a lawful affirmative admission to a non-law enforcement person, the reversible error rule of *Clenin v. State*, 573 P.2d 844 (Wyo.1978), is not applicable. *Tortolito*, 885 P.2d at 870.

We granted Tortolito's petition for rehearing to reconsider this court's determination of the comment-upon-silence question.

## DISCUSSION

*Standard of Review*

1. WYO. CONST. ART. 1 § 11.

■ Before this court's decision in *Clenin*, comment-upon-silence issues were resolved under the due process rationale articulated in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), adopted by this court in *Irvin v. State*, 560 P.2d 372 (Wyo.1977). However, in *Clenin*, this court departed from due process analysis and analyzed whether the self-incrimination provision of Article 1, Section 11 of the Wyoming Constitution offered greater protection.

In *Clenin* a unanimous court held:

The right of an accused to remain silent, however, under Art. 1, § 11 of the Constitution of the State of Wyoming ... does not depend upon his being advised of that right, but exists by virtue of the constitutional language. Advice as to that right by law enforcement officers ... is only for the purpose of expanding its protection by assuring that the accused person is aware of it.

. . . . .

Historically, our Court has jealously guarded the right ... against any infringement.... We hold that under this section of our state constitution any comment upon an accused's exercise ... is prejudicial, and will entitle an accused to reversal of his conviction.

*Clenin*, 573 P.2d at 846.

*Clenin* held that, by virtue of the constitutional provision's language itself, silence was afforded greater protection than that afforded under due process. Unfortunately, in subsequent comment-upon-silence cases, this court strayed from *Clenin's* reliance on the constitutional provision and reverted to precedent based upon due process considerations, the result of which gives little guidance to litigants, counsel, or trial courts. Notwithstanding, *Clenin* clearly signifies WYO. CONST. Art. 1 § 11 is the basis for analysis of all comment-upon-silence issues.

The state constitutional prohibition against self-incrimination [1] states in relevant part:

No person shall be compelled to testify against himself in any criminal case.... WYO. CONST. ART. 1 § 11.

■ In *Jerskey v. State*, 546 P.2d 173 (Wyo.1976), we held the provision prohibited prosecutorial comment upon silence eventuated by a defendant's failure to testify at trial. *Jerskey*, 546 P.2d at 176 n. 6. Following the United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held the due process clause of the Fourteenth Amendment prohibited comment upon an accused's pretrial silence,[2] judging it fundamentally unfair to assure an accused he can remain silent and then use that silence against him at trial. *Doyle*, 426 U.S. at 617–18, 96 S.Ct. at 2244–45; *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710,

---

1. In *Abeyta v. State*, 592 P.2d 705 (Wyo.1979), Justice Guthrie, Ret., explored the purpose of the federal and Wyoming constitutional prohibitions against self-incrimination. One reason for the enforcement of this right "is to safeguard against fear and torture so that there will not be extorted expressions of untruth." *Id.* at 707–708. Another reason is to express the respect that a government must show to the dignity and integrity of its citizens. *Id.* at 708.

2. *Miranda* and *Doyle* were based upon the United States Constitution's self-incrimination provision which states:

No person shall ... be compelled in any criminal case to be a witness against himself,.... U.S. CONST.AMEND. V

Under the Federal Constitution, pre-trial silence encompasses post-arrest and post-*Miranda* silence.

1716, 123 L.Ed.2d 353, 366 (1993). *Irvin* adopted *Doyle,* but this court in *Clenin* turned from due process analysis to analysis under the self-incrimination provision of the Wyoming Constitution when presented with the different factual situation involving a suspect who had not been advised of his *Miranda* rights. *Clenin,* 573 P.2d at 846.

*Clenin* held the state constitutional language itself protected an accused's right to silence and the existence of that protection did not depend upon *Miranda* advice. *Clenin,* 573 P.2d at 846. Subsequent decisions limited *Clenin* to post-arrest situations without further analysis of the provision and without authority.[3] We conclude the limitation was erroneous. Based upon the broader protection of our own state constitution, *Clenin* expanded the right to silence and surmounted not just part of the post-arrest limitation but all limitations imposed by due process analysis.

### 2. Pre-arrest Silence

[3, 4] In analyzing *Clenin* and the state constitutional language, we discern no rational reason to limit the protection embracing the citizen's right to silence to the post-arrest or post-*Miranda* situation. The constitutional right to silence exists at all times—before arrest, at arrest, and after arrest; before a *Miranda* warning and after it. The right is self-executing.

Under the erroneous view that no constitutional right to pre-arrest silence exists, a citizen who stands mute in the face of accusatory interrogation about the crime during a law enforcement investigation and inquiry is without constitutional protection against law

enforcement personnel who treat silence as probative evidence of guilt. Law enforcement personnel can time the citizen's arrest to occur after the citizen stands mute in the face of the accusation. This practice, which encourages manipulative timing of arrests, does not serve the constitutional provision's purpose of protecting the right to silence during pre-arrest, accusatory interrogation by the state's agents. Permitting prosecutorial use of that silence discourages a law enforcement system's reliance upon extrinsic evidence independently secured through skillful investigation and, instead, encourages reliance upon compulsory self-disclosure. *See Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 1764 12 L.Ed.2d 977 (1964).

 Since the right to remain silent is a self-executing right, an accused is presumed to be exercising the right by his silence, pre-arrest and pre-*Miranda* when questioned by the state's agents for purposes of a criminal investigation.[4] Accordingly, the prosecutorial use of the citizen's silence to infer the guilt of the citizen is constitutionally prohibited.

 Prosecutorial violations are subject to the *Clenin* rule's mandate that failure to respect the constitutional right of the citizen-accused not to have his silence called to the jury's attention will entitle the accused to a reversal of conviction. *Westmark v. State,* 693 P.2d 220, 221–22 (Wyo.1984), *citing Clenin.* A reference to silence which is not a "comment" will not be reversed absent a showing of prejudice. *Parkhurst v. State,* 628 P.2d 1369, 1382 (Wyo.1981).

---

3. *See Parkhurst v. State,* 628 P.2d 1369 (Wyo. 1981), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981); *Clenin* was overruled in *Richter v. State,* 642 P.2d 1269 (Wyo.1982) and a harmless error rule adopted. *Richter* was overruled by *Westmark v. State,* 693 P.2d 220 (Wyo. 1984); *Summers v. State,* 725 P.2d 1033 (Wyo. 1986); *Tortolito v. State,* 885 P.2d 864 (Wyo. 1994).

4. In contrast, *see Abeyta v. State,* 592 P.2d 705 (Wyo.1979), holding that the admission of evidence of a conversation between an apparent friend and the defendant did not violate the right to silence under the state provision because:

"[i]n this case, there is no custodial interrogation nor any activity of the state or its enforcement officers that did in any manner contravene the underlying purpose of these amendment[s]." *Abeyta,* 592 P.2d at 708.

*Abeyta* could have pointed out, but did not, that admission of nonverbal conduct (silence) as a statement, in this particular factual context, is an evidentiary question and not a constitutional argument. *See Parkhurst,* 628 P.2d at 1389 n. 16 (Rose, J., concurring). For a discussion of the evidentiary considerations, see JAMES DUFF, JR., ANNOTATION, *Nonverbal Reaction to Accusation, Other Than Silence Alone, as Constituting Adoptive Admission Under Hearsay Rule,* 87 A.L.R.3d 706 (1978).

### Prosecutorial Comments on Tortolito's Silence

 The record indicates that following accusations against Tortolito by the robbery victim and a bus station employee, police detained and interrogated Tortolito about those accusations. At trial, the prosecutor's questions to police officers elicited numerous answers that Tortolito remained silent when police officers accused him of taking the money.

[Prosecutor]: Did Mr. Tortolito respond in any way to Officer Pederson telling you about Mr. Tortolito taking the money?

A: He didn't say a word.

[Prosecutor]: Mr. Tortolito didn't say a word in response to "he took money from a passenger inside, a fifty and a twenty"?

A: No sir, he just stood there.

Testimony revealed that Tortolito was then searched, and when money was found, the police officers again asked Tortolito where he had gotten the money.

[Prosecutor]: And did Mr. Tortolito respond?

A: No.

Further trial questioning elicited additional testimony concerning Tortolito's silence in the face of accusation but before the police officers placed handcuffs on him. During his opening statement, the prosecutor mentioned Tortolito's silence in the face of police accusations; and during his closing argument, he characterized the silence as an admission.

 A comment upon an accused's silence occurs when used to the state's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt. *Parkhurst,* 628 P.2d at 1382.

The prosecutor elicited this "silence" testimony as proof of guilt and then, during closing argument, characterized it as an admission of guilt. The prosecutor's use of Tortolito's constitutionally protected silence in the face of the officers' accusations was impermissible comment, entitling Tortolito to reversal of his conviction.

Reversed and remanded for a new trial.

THOMAS, Justice, dissenting.

I must dissent from the opinion of the court upon rehearing. Having written the opinion in *Clenin v. State,* 573 P.2d 844 (Wyo. 1978), for the court, I am in no position to deny that case and the rule it espoused. I do, however, understand the rule of *Clenin* to be a post-arrest rule and, therefore, more narrow than the rule now articulated by the majority. My protest is really against judicial vacillation and the unfair dilemma posed for the trial court and the prosecuting attorney. Both must feel that they have been blind sided in a classic manner.

The tension over the proper judicial method of dealing with a comment upon the silence of an accused person is starkly manifest in the decisions of this court. The rule articulated in *Clenin* was overruled some four years later in *Richter v. State,* 642 P.2d 1269 (Wyo.1982). *Richter,* in turn, was overruled two years later by *Westmark v. State,* 693 P.2d 220 (Wyo.1984), and the *Clenin* holding was resurrected. It must be emphasized that *Clenin* and *Westmark* were directed at the effect to be given error arising out of a comment upon the exercise by an accused person of the right to silence. The error *per se* rule was espoused. Then we decided *Brewster v. State,* 712 P.2d 338 (Wyo.1985), in which *Westmark* was followed, and *Parkhurst v. State,* 628 P.2d 1369 (Wyo. 1981), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981), was distinguished on the ground that the jury was not likely to infer an admission of guilt from the defendants' nonresponsiveness. In *Brewster,* the parameters of the rule foreclosing comment upon the exercise by an accused of his right to silence were accurately summarized:

> In a long line of cases culminating in *Westmark v. State,* supra, this court has held that prosecutorial **comments at trial concerning the accused's silence following arrest** violate rights guaranteed by the Fifth Amendment to the United States Constitution and Art. 1, § 11 of the Wyoming Constitution.

*Brewster,* 712 P.2d at 340 (emphasis added, footnotes omitted).

The following year, the issue arose in *Gomez v. State,* 718 P.2d 53 (Wyo.1986), and *Cheatham v. State,* 719 P.2d 612 (Wyo.1986). The facts of *Gomez* were determined to be more similar to those in *Parkhurst* and, consequently, did not amount to a comment upon the exercise of the right to silence. In *Gomez,* 718 P.2d at 56, the court noted that:

> **The essential justification for the development of the rule espoused in *Westmark v. State,* supra, is that, once a defendant has been arrested and formally advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), what occurs from that point on is inherently equivocal. One cannot tell whether a failure of the defendant to respond is because he is exercising the constitutional right to remain silent about which he has been formally advised, or whether he simply has nothing to say.** The Supreme Court of the United States then says that it is inherently unfair to utilize any of the traditional approaches which had permitted the state to call attention to the defendant's failure to speak when an innocent person reasonably would be expected to offer an explanation. (Emphasis added.)

In *Cheatham,* closing argument about the lack of evidence was held not to be a comment upon the exercise of the right to silence in accordance with prior precedent. Later the same year, in *Summers v. State,* 725 P.2d 1033 (Wyo.1986), *confirmed on reh'g,* 731 P.2d 558 (Wyo.1987), this court, although without a clear majority, limited the rule in *Clenin* and *Westmark* to comments relating to the silence of an accused "either after his arrest or after he has been advised of his constitutional right to remain silent." *Summers,* 725 P.2d at 1048–49.

This was the state of our law in Wyoming at the time Tortolito was tried. I am not persuaded the court strayed from *Clenin* in this series of cases. Certainly, it did not go as far afield as this case now does. In any event, we normally expect our trial courts and our attorneys to follow the rules pronounced in our opinions. Now, the trial judge and the prosecuting attorney discover they were wrong to do so. I am not con-

vinced they were wrong to follow our cases, but I am convinced justice has not been served in this case.

Once again, this court has transformed the villain into a victim. Like most feats of legerdemain, this is accomplished by keeping the audience partially in the dark. Since the earlier opinion of the court is withdrawn, it is necessary to flesh out some of the "unique dynamics" of this case in order for the audience to have an understanding of the circumstances against which the expanded version of the rule found in *Clenin* is applied.

It is questionable Tortolito was engaged in **the exercise of his right to silence.** The bus driver who first confronted Tortolito testified:

Q. What did you do?

A. I asked Stevie [Tortolito] to come over to where I was and asked him whether he had taken, you know, the money from [the victim], and he said, "Yeah, and you're not going to get it back." Or words to that effect.

Q. This is what Mr. Tortolito is responding to you?

A. Right, to my question about whether he stole the money from [the victim].

As succinctly stated in 1 WAYNE R. LAFAVE & JEROLD H. ISRAEL, CRIMINAL PROCEDURE § 6.10 at 541 (West Publishing Co. ed. 1984), "it is clear that *Miranda* does not govern interrogation by private citizens acting on their own." The decided cases support this proposition. *E.g., United States v. Pace,* 833 F.2d 1307 (9th Cir.1987), *cert. denied,* 486 U.S. 1011, 108 S.Ct. 1742, 100 L.Ed.2d 205 (1988); *United States v. Webb,* 755 F.2d 382, *reh'g denied,* 762 F.2d 1004 (5th Cir.1985); *United States v. Pullen,* 721 F.2d 788 (11th Cir.1983); *People v. Whitt,* 36 Cal.3d 724, 205 Cal.Rptr. 810, 685 P.2d 1161 (1984); *People v. Hawkins,* 53 Ill.2d 181, 290 N.E.2d 231 (1972); *Rutledge v. State,* 525 N.E.2d 326 (Ind.1988); *Lipps v. State,* 254 Ind. 141, 258 N.E.2d 622 (1970); *Commonwealth v. Allen,* 395 Mass. 448, 480 N.E.2d 630 (1985); *Commonwealth v. Rodwell,* 394 Mass. 694, 477 N.E.2d 385 (1985); *Commonwealth v. White,* 353 Mass. 409, 232 N.E.2d 335 (1967), *cert. denied,* 391 U.S. 968, 88

S.Ct. 2039, 20 L.Ed.2d 881 (1968); *State v. LaRose,* 286 Minn. 517, 174 N.W.2d 247 (1970); *State v. Bodtke,* 219 Neb. 504, 363 N.W.2d 917 (1985); *State v. Valpredo,* 75 Wash.2d 368, 450 P.2d 979 (1969).

The unrefuted testimony of the bus driver, under oath, to the effect Tortolito admitted he had taken the money from the victim must be accepted as something more than an allegation despite the effort in the majority opinion to mask it as such. The case then must be examined in light of the affirmative admission already made by Tortolito. That admission is antithetical to any conclusion that Tortolito was exercising his right to silence.

The majority opinion upon rehearing makes no mention of the "cockatiel" story. The record discloses testimony presented on Tortolito's behalf that he had returned two cockatiels to the Wal–Mart store in Cheyenne on the same day and had received a cash refund substantially equivalent to the money in Tortolito's possession at the time of the encounter with the police officers. This testimony indeed was fortuitous, but it generated the necessity to introduce Tortolito's silence during the early stages of the investigation. Nothing could be more natural than for Tortolito to tell the bus driver and the police officers the money in his pocket came from Wal–Mart, not the victim, if that were so.

Tortolito points to the following portions of the transcript of the testimony of a police officer:

Q. What then happened? Did Mr. Tortolito respond in any way to Officer [P] telling you about Mr. Tortolito taking the money?

A. He didn't say a word.

[DEFENSE COUNSEL]: Your Honor, I'm going to reiterate the objection I made at the side bar conference earlier during opening statement.

THE COURT: Overruled.

Q. Mr. Tortolito didn't say a word in response to "He took money from a passenger inside, a fifty and a twenty?"

A. No, sir, he just stood there.

Q. What happened then?

A. Officer [P] kept talking to him for a couple of minutes, receiving no understandable response. At that time we decided to search his pockets.

\* \* \* \* \* \*

Q. What was Officer [P] doing while you were searching in the right pocket of Mr. Tortolito?

A. He was searching Stevie's left pocket.

Q. Did Officer [P] find any money?

A. I believe he did, but I'm not totally certain.

Q. What happened then?

A. Well, he was talking to Stevie, "Where did you get this?" meaning the money I had in my hand.

Q. Who was questioning Stevie, "Where did you get this?"

A. Officer [P].

Q. And did Mr. Tortolito respond?

A. No.

\* \* \* \* \* \*

Q. What did you do?

A. I turned and asked him, "Stevie, what did you do with the money?" He said—he didn't say nothing.

\* \* \* \* \* \*

Q. How many times do you recall asking Mr. Tortolito if he had indeed taken the money from the passenger?

A. A couple of times.

Q. Did he ever respond?

A. No, he did not.

Q. In any way—yes, no?

A. Just stared at me.

In addition, Tortolito relies upon a portion of the closing argument by the prosecuting attorney:

Officer [P] says, "Where's the victim?" "Well, he's inside." "Bring him out." And so [the victim] was brought out, and he faced Mr. Tortolito and said, "He's the guy that took my money. A 50 and a 20 and he kept some change." He said that it was in his billfold and he had to stare at it to figure it out.

And in the face of that, how is Mr. Tortolito, what does he say? Nothing. He doesn't say, "That's my money."

Officer [H] arrives. "What's going on?" The same thing. "Stevie, where's this man's money?" Did you hear that question asked by Officer [P]? "Stevie, did you take this man's money?" He didn't say anything.

The officers search him and find the money. Officer [P] takes the money, puts it in Stevie's face. "Stevie, did you take this man's money?" And what does he do then? He swings out, trying to grab for the money. That's when the scuffle with Officer [H] then started, into the wall and down on the ground.

Admissions. All of those admissions. "Yeah, I took it, and I'm not giving it back." And the silence in the face of the very clear accusation.

You didn't hear anything about cockatiels then, did you? His mind is clouded with alcohol and he can't think of it.

The majority claims to have restored the law as it is found in *Clenin* and *Westmark*. In fact, the majority has extended the rule of law found in *Clenin* so that all situations of silence when confronted by law enforcement must be kept from the jury. Indeed, one reading trial transcripts will marvel at the gross ineptitude of law enforcement officers. They will not be able to state what inquiry they made of a suspect. That would have to be treated as a comment upon the exercise of the right to silence by the suspect since the officers would not be permitted to report the lack of response. Consequently, it must appear the officers did not even ask the suspect for an explanation. It hardly seems fair to one suspected of the commission of a crime not to ask that person's side of the story. I can almost hear the plaintive argument of the creative public defender, "They did not even ask my client what happened!"

The *Clenin* rule is much more limited than the rule articulated by the majority here. Succinctly, the *Clenin* rule is:

We hold that under this section of our state constitution [Article 1, Section 11 of the Constitution of the State of Wyoming] any comment upon an accused's exercise of his right of silence, whether by interrogation of the accused himself, or by interrogation of others inherently is prejudicial, and will entitle an accused to reversal of his conviction.

*Clenin,* 573 P.2d at 846 (emphasis added).

The majority also fails to recognize *Clenin* as a post-arrest case. It is limited by its facts and relies upon authority discussing the issue only in the context of post-arrest and post-reminder situations.

I use post-reminder, because, given the extension of *Clenin* to pre-arrest situations, there obviously is no need to offer a warning as to the constitutional right to remain silent. The only significance of giving the accused the traditional *Miranda* warning concerning the right not to testify against oneself must be to remind the subject of information he or she is presumed to possess. The entire thrust of *Miranda* is blunted by holding, in effect, that all citizens are presumed to be aware of that right and to be relying upon it. *Westmark* certainly cannot be understood as a majority ruling in favor of extending *Clenin* to pre-arrest situations.

In my view, rather than punish the prosecutor and the trial court for following the law at the time Tortolito was tried, the harmless error rule of *Richter* should be applied. If ever a case arose in which error could be recognized as harmless, this has to be such a case. Tortolito has tried to sell the "cockatiel" story to two juries. Neither body was buying it, and it won't be bought when the testimony in a new trial is sanitized of references to Tortolito's silence. The affirmative admission uttered to the bus driver still will carry the field. Consequently, there is nothing to be accomplished by remanding for a new trial other than to insure the expenditure of more of the public's money.

If the court chooses to expand upon *Clenin,* this would be a most appropriate instance in which to invoke the "Sunburst" rule. *Great Northern Ry. Co. v. Sunburst Oil & Ref. Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). In *Sunburst,* the Supreme Court of the United States acknowledged that "[a] State in defining the limits of adherence to precedent may make a choice for

itself between the principle of forward operation and that of relation backward." *Sunburst,* 287 U.S. at 364, 53 S.Ct. at 148. By making the adoption of the new version of the *Clenin* rule prospective only, we would avoid the injustice to the state that is inflicted by the majority ruling.

The shifting sands of Wyoming jurisprudence have been pummeled by another dust storm. It indeed must be disappointing to the district attorney and the trial judge who, after trying a case to the jury in accordance with the extant rules, discover the rules have changed and the case is reversed. It is dismaying when it appears the primary reason the rules have changed is that there is a different justice on this court. A supreme court has an obligation to be equally fair to all parties. The prosecuting attorney and the trial court were entitled to believe they were proceeding in accordance with the law as established by this court.

I still would affirm Tortolito's conviction.