998 P.2d 907 (2000)
100 Wash.App. 794
STATE of Washington, Respondent,
v.
Martin Jay HENDERSON, a/k/a Martin Jay Davey, Appellant.
No. 23330-4-II.
Court of Appeals of Washington, Division 2.
May 12, 2000.
*908 Scott Montegu Charlton, Clallam County Deputy Pros. Atty., Port Angeles, for Respondent.
Rita Joan Griffith, Griffith & Cole, Pllc (Court Appointed), Seattle, for Appellant.
ARMSTRONG, C.J.
Martin Henderson was convicted as an accomplice in a robbery and attempted robbery of two men who agreed to give a ride to Kevin Early, an acquaintance of Henderson. Henderson admitted that he was in the car when the robbery occurred but denied participating. On appeal, Henderson contends that he was denied the right to a fair trial because the prosecutor commented on his right to remain silent and committed several instances of prosecutorial misconduct constituting cumulative error. We agree and accordingly reverse and remand for a new trial.

FACTS
In February 1998, two young men, Edward Countryman and John Zellmer, agreed to give Kevin Early a ride from Brinnon to Sequim for $200. Countryman drove, Zellmer sat in the passenger seat, and Early sat in the back of the car.
As the group approached Sequim, Early directed them to turn onto Chicken Coop Road. When they turned, they saw two women, Connie Rodgers and her daughter, walking along the road. Early said he knew the women and asked Countryman and Zellmer to give them a ride. When the group stopped at the cabin where Rodgers lived, Early went inside for approximately 20 minutes. Early returned to the car with a blonde man. During that time, Countryman and Zellmer sat in the car waiting for Early to return from the cabin. They could hear a fight going on inside between Rodgers and a man that was not Early.
According to Countryman and Zellmer, when Early returned he told them that he had their money but his friend, Martin Henderson, needed a ride to another friend's house. Along the way, Early yelled at them and said he had a gun at Countryman's back. He demanded that they turn over everything in their pockets. Countryman had $15, a check for his grandmother, and a traffic citation. Zellmer had no money. Neither Countryman nor Zellmer saw a gun. Early and *909 Henderson got out of the car near the 7 Cedars Casino.
Henderson did not testify but, in his custodial statements to Detective Moores, he admitted being in the car. He said he left with Early after fighting with Connie Rodgers. He said his memory was foggy because he was drunk and was still thinking about the fight. He did remember that Early was yelling and intimidating the "kids" along the way and that there was some paper exchanged. He said the kids were "scared to hell" and "freaked out" but he denied thatanyone threatened to kill Countryman or Zellmer.
Both Countryman and Zellmer testified that before Early began yelling at them, Henderson said several times, "Do you want me to do it?" Early said, "No, I'll do it." Countryman thought, at the time, that they were referring to who would give directions. But shortly after this exchange, Early said he had a .357 aimed at their backs. Countryman and Zellmer both testified that Henderson said, "[J]ust do what he says" or "Just do what he tells you," and told them not to drive behind the casino because there were cameras. Zellmer testified that Henderson said, "we should take the car, too." On cross-examination, both Countryman and Zellmer were impeached with inconsistencies between their testimony and their statements to the police as to what Henderson said in the car.

ANALYSIS

A. Comment on Fifth Amendment Right to Remain Silent
Henderson first argues that the trial court erred in denying his motion for mistrial after the prosecutor asked Detective Moores whether Henderson had been asked to be tape-recorded during his interview. Henderson contends that this question and the officer's response were an improper comment on his Fifth Amendment right to remain silent.[1] Although we do not agree that the question was a "comment" on Henderson's right to remain silent, the reference was improper.
During direct examination, the prosecutor asked Detective Moores if he "ever asked Mr. Henderson if he would be tape recorded." Moores said, "Yes." Defense counsel objected immediately, and the jury was excused while the court heard arguments on the objection. Defense counsel's objection was based on Moores' testimony at the CrR 3.5 hearing. His testimony revealed that Henderson said, if the officer wanted to tape-record the interview, he wanted an attorney and did not want to talk. Defense counsel argued that the question implicated Henderson's right to remain silent and right to counsel.
The prosecutor gave two reasons why the question should be allowed. First, he argued that the question was relevant to demonstrate the credibility of the officer by showing that he was thorough in his investigative techniques. According to the prosecutor, "[w]ithout this information the jury might think this is a pretty sloppy detective." Second, the prosecutor said that the refusal to be recorded reflected on Henderson's credibility because "the defendant wants to talk but he doesn't want to be tape recorded."
The court sustained the objection, recognizing that "one inference would be that the defendant realized things were getting serious and chose not to talk further." Defense counsel then moved for a mistrial, arguing that the jury had already heard the question and could not disregard it or the 10-minute delay in which the issue was debated. The motion for mistrial was denied, and the court instructed the jury to disregard the question.
Washington courts have held that the Fifth Amendment prohibits the State from using the defendant's pre-arrest silence as substantive evidence of his guilt.[2]State v. *910 Lewis, 130 Wash.2d 700, 705, 927 P.2d 235 (1996) (citing State v. Easter, 130 Wash.2d 228, 922 P.2d 1285 (1996)). Therefore, "[a] police witness may not comment on the silence of the defendant so as to infer guilt from a refusal to answer questions." Lewis, 130 Wash.2d at 705, 927 P.2d 235; see Easter, 130 Wash.2d at 236, 922 P.2d 1285. But "a mere reference to silence which is not a `comment' on the silence is not reversible error absent a showing of prejudice." Lewis, 130 Wash.2d at 706-07, 927 P.2d 235 (quoting Tortolito v. State, 901 P.2d 387, 390 (Wyo. 1995)); State v. Sweet, 138 Wash.2d 466, 481, 980 P.2d 1223 (1999). "Comment" means that the State uses the accused's silence to suggest to the jury that the refusal to talk is an admission of guilt. Lewis, 130 Wash.2d at 707, 927 P.2d 235 (citing Tortolito, 901 P.2d at 391).
For example, in Easter the State commented on the defendant's silence when the officer referred to him as a "smart drunk." Easter, 130 Wash.2d at 234, 922 P.2d 1285. The officer explained that he meant that Easter was "evasive, `wouldn't talk' and was hiding something." Easter, 130 Wash.2d at 234, 922 P.2d 1285. In closing, the prosecutor repeatedly referred to the defendant as a "smart drunk" and argued that these words answered all the questions and summed up the testimony at trial. Easter, 130 Wash.2d at 234, 922 P.2d 1285. These comments constituted prejudicial error. Easter, 130 Wash.2d at 242-43, 922 P.2d 1285.
In contrast, the officer's statements in Sweet were a mere reference to the defendant's silence, which did not warrant reversal absent a showing of prejudice. Sweet, 138 Wash.2d at 481, 980 P.2d 1223. In Sweet, the officer testified that Sweet said he would take a polygraph test and that he would give the officer a written statement after he had consulted with his attorney. These items were not introduced at trial. Sweet, 138 Wash.2d at 480, 980 P.2d 1223. The court upheld the conviction because Sweet did not show that he was prejudiced by the statements. Sweet, 138 Wash.2d at 481, 980 P.2d 1223.
Here, the facts are more like those in Sweet than in Easter. Moores did not say that Henderson refused to be tape-recorded. And even if, as Henderson contends, the jury could infer his refusal to talk to the officer from a request to be tape-recorded, neither the officer nor the prosecutor commented on Henderson's refusal to speak.
We review the denial of a motion for mistrial under an abuse of discretion standard. Lewis, 130 Wash.2d at 707, 927 P.2d 235. A mistrial should not be granted unless "the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." Lewis, 130 Wash.2d at 707, 927 P.2d 235 (citation omitted). Because Henderson did not show prejudice, the trial court did not abuse its discretion in denying the motion for a mistrial. As the court recognized in Lewis, "[m]ost jurors know that an accused has a right to remain silent and, absent any statement to the contrary by the prosecutor, would probably derive no implication of guilt from a defendant's silence." Lewis, 130 Wash.2d at 706, 927 P.2d 235 (citing Tortolito, 901 P.2d at 390). But we find the prosecutor's reference to Henderson's right to remain silent to be improper and prejudicial under the doctrine of cumulative error discussed below.

B. Prosecutorial Misconduct
Henderson next contends that he was denied a fair trial because "the prosecutor asked questions of witnesses and made comments in court [that] placed inadmissible and prejudicial information before the jury." We agree.
Henderson claims the following misconduct: (1) repeated references to a fight between Henderson and Connie Rodgers, in which Rodgers received injuries that put her in the hospital; (2) asking whether the sheriff's office put together a photo montage using pictures of Henderson that they already had on hand; (3) improperly testifying by stating that the alleged crime was a robbery; (4) referring to one of defense counsel's statements as "garbage editorialization," and requesting that counsel be sanctioned in *911 front of the jury; and (5) inviting an emotional response from the jury by implying that the crime charged is comparable to rape or robbery. We agree that the first three references were improper.
To prevail on an allegation of prosecutorial misconduct, a defendant must show both improper conduct and prejudicial effect. E.g., State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995) (citing State v. Furman, 122 Wash.2d 440, 455, 858 P.2d 1092 (1993)). Prejudice is established by demonstrating a substantial likelihood that the misconduct affected the jury's verdict. Pirtle, 127 Wash.2d at 672, 904 P.2d 245.
But absent a proper objection, the issue of prosecutorial misconduct cannot be raised on appeal unless the misconduct was so flagrant and ill-intentioned that no curative instruction would have obviated the prejudice engendered by the misconduct. State v. Hoffman, 116 Wash.2d 51, 93, 804 P.2d 577 (1991); State v. Jerrels, 83 Wash.App. 503, 508, 925 P.2d 209 (1996); State v. Suarez-Bravo, 72 Wash.App. 359, 367, 864 P.2d 426 (1994). The defendant "bears the burden of establishing both the impropriety of the prosecutor's conduct and its prejudicial effect." Furman, 122 Wash.2d at 455, 858 P.2d 1092 (citations omitted).
1. Reference to Fight between Henderson and Rodgers
In the State's direct examination, Detective Moores testified that, during the interview, Henderson told him that he was having problems with his memory because "he may have still been drunk and he was still thinking about the fight he had with Connie Rodgers." The prosecutor then attempted to clarify whether Henderson had been referring to the fight that he had with Rodgers on February 10, the day of the robbery, or a fight that occurred on February 13, the day of Henderson's arrest. The only objection was to a leading question.
When Rodgers testified, the prosecutor asked on cross-examination whether she had argued with Henderson "that evening."[3] Rodgers said she had, and the prosecutor then asked, "And as a matter of fact, two nights later you had another argument with Mr. Henderson; is that right?" Defense counsel objected based on "scope," and the prosecutor said he would "show relevance." The court overruled the objection. Rodgers then responded "No," and the prosecutor asked the following questions:
Q. Well, do you recalldo you recall being contacted by a Detective Fuchser concerning this case?
A. I remember being contacted by a detective.
Q. Well?
A. I don't know his name.
Q. Pardon?
A. I don't know what his name was?
Q. All right. Detective tried to ask you some questions about that particular evening; do you recall that?
A. Um-hum.
Q. And this contact was made by a detective at the hospital; is that correct?
A. Right.
Q. And you were at the hospital because had you suffered some injuries; is that correct?
A. Um-hum.
At that point, defense counsel objected based on relevance. When the court suggested and defense counsel agreed that the objection should be heard outside the presence of the jury, the prosecutor said, "Tell you what: Rather than have the jury get removed, your Honor, I'll move on to something else." The court then said, "Question is withdrawn."
But later, the prosecutor asked Detective Fuchser on redirect where he had contacted Rodgers. Fuchser said, "It was in the radiology department at Olympic Memorial Hospital." The prosecutor then asked if Detective Fuchser knew why she was there, and defense counsel objected based on hearsay. The court allowed him to answer yes or no to *912 the question, and Fuchser said, "Yes, I do." The prosecutor then asked whether she was capable of talking with him, and Fuchser said, "Yes, she was."
Although the first reference to the February 13 fight was raised in an apparent attempt to clarify Henderson's statements to Detective Moores and did not suggest a further assault by Henderson, the second reference was clearly irrelevant and improper. Cf. State v. Montague, 31 Wash.App. 688, 690-92, 644 P.2d 715 (1982) (asking defendant on trial for rape whether he had been a suspect in another rape held to be an improper reference to inadmissible evidence); State v. Torres, 16 Wash.App. 254, 256, 554 P.2d 1069 (1976) (prosecutor's reference to uncharged burglary in rape case improper). Evidence Rule 404(b) prohibits the admission of prior bad acts "to prove the character of a person in order to show action in conformity therewith." After defense counsel objected based on scope, the prosecutor said he would show relevance but he did not. He simply continued with the line of questioning and elicited testimony suggesting that Henderson had injured Rodgers in a fight. There was no suggestion by the prosecutor that evidence of the second fight was admissible for any proper purpose under ER 404(b).[4] The prosecutor then compounded the problem by raising the issue again when he asked Detective Fuchser where he interviewed Rodgers.
2. Reference to photograph of Henderson "already on hand"
Countryman and Early were shown a photo montage of both Henderson and Early. In discussing how the montage was put together, the prosecutor asked the following question: "The photo montage you have identified, No. 3 and No. 4, those were put together with photographs that were already on hand; is that correct?" The officer said, "That's correct." There was no objection from defense counsel. Henderson claims that from this question the prosecutor "clearly implied that the office had a `mug shot' or booking photograph of Mr. Henderson, associated with prior criminal activity." This single reference may or may not have suggested to the jury that the police had a mug shot of Henderson from previous criminal activity. But in closing the prosecutor said:
You are supposed to buy the argument that he comes to an arraignment to look good for a judge? That argument is nonsense, ladies and gentlemen. Not only do we have a photograph of what Mr. Henderson looked like on February 13th but the sheriff's department had a photograph of him on hand before that."
Thus, the prosecutor made clear that the sheriff's office had Henderson's photograph "on hand." This improperly suggested that Henderson had previously been arrested or convicted on another charge. See Torres, 16 Wash.App. at 256, 554 P.2d 1069; ER 404(b). "[M]ug shots from a police department `rogues' gallery' are generally indicative of past criminal conduct and will likely create in the minds of the jurors an inference of such behavior." United States v. Fosher, 568 F.2d 207, 213 (1st Cir.1978).
3. Improper Testifying
Henderson also argues that the prosecutor expressed a personal belief in the defendant's guilt by commenting on defense counsel's cross-examination. We agree.
During cross-examination of Zellmer, defense counsel attempted to introduce his theory of the case that this had not been a robbery but was a bogus drug deal. Zellmer was asked whether Early had agreed to pay them for the ride, at least in part, with methamphetamine. Zellmer denied this. Defense counsel then asked, "And after you went to the Chicken Coop Road address and there was the altercation between you and Kevin and Mr. Countryman in the car by 101." The prosecutor interrupted and objected to the form of the question. The court told counsel to "reask" the question. Defense counsel started again, "After you left the Chicken Coop Road address and the altercation," and the prosecutor interrupted again. He said, "I'll object to the form of *913 the question. This was not an altercation. It was a robbery." The trial court asked defense counsel to rephrase the question.
Henderson claims that this was an expression of personal belief that a robbery had occurred and invited the jury to decide the case based on the State's representations. It is improper for the prosecutor to express his personal belief of the defendant's guilt. United States v. Young, 470 U.S. 1, 8-9, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (citations omitted); United States v. Smith, 982 F.2d 681, 684 (1st Cir.1993); State v. Case, 49 Wash.2d 66, 67, 298 P.2d 500, 50 A.L.R.2d 766 (1956). We agree that the comment was improper because the defense was attempting to establish one of its theories in the case, that this was a bogus drug deal. By interrupting defense counsel and interjecting his own beliefs about the nature of the crime, the prosecutor made an improper comment.

C. Cumulative Error
The cumulative effect of repetitive error may be so flagrant that no instruction can erase the error. Case, 49 Wash.2d at 73, 298 P.2d 500; Torres, 16 Wash.App. at 263, 554 P.2d 1069. Here, we have found prosecutorial misconduct based on (1) the reference to the defendant's right to remain silent; (2) repeated references to a second fight between Henderson and Rodgers that resulted in injuries to Rodgers; (3) the reference to photographs that the sheriff had "on hand;" and (4) the challenge to defense counsel's use of "altercation" when in the prosecutor's opinion the crime was really a "robbery." And the evidence was far from overwhelming that Henderson participated in the robbery. He admitted being present but denied taking part. The State's only evidence establishing his participation in the crime consisted of the victims' testimony as to statements he made during the alleged robbery, and both victims were impeached because they had not reported the alleged statements to the police. We hold that, when viewed against the evidence, the cumulative effect of the incidents of prosecutorial misconduct were so ill-intentioned and flagrant as to have materially affected the outcome of the trial. No instruction could have erased the error. See Case, 49 Wash.2d at 73-74, 298 P.2d 500; Torres, 16 Wash.App. at 263, 554 P.2d 1069.
Reversed and remanded for a new trial.
MORGAN, J., and HOUGHTON, J., concur.
NOTES
[1] Henderson contends that the prosecutor's question was a comment on his pre-arrest right to remain silent. Although we note that Henderson was under arrest on an outstanding warrant at the time of his statement, we make no determination of whether Henderson's statement was made pre- or post-arrest for purposes of the robbery and attempted robbery charges. Instead, we simply respond to Henderson's argument as presented.
[2] The Fifth Amendment provides: "No person... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.
[3] Apparently referring to the evening of the robbery on February 10, which had been discussed on direct examination.
[4] Evidence of prior crimes, wrongs, or acts may be admissible as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).